**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street NE<br>Washington, DC 20549,<br><br>                                        Plaintiff,<br><br>v.<br><br>BRIAN K. HUTCHISON<br>c/o Davis Wright Tremaine<br>1001 G Street NW, Seventh Floor<br>Washington, DC 20001,<br><br>                                        Defendant. | Case No. 22-CV-2296<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

**SUMMARY**

1.      This is a disclosure fraud and accounting fraud case in which Brian K. Hutchison ("Hutchison"), the CEO of RTI Surgical Holdings ("RTI"), masked disappointing sales numbers from Q1 2015 through Q2 2016 (the "Relevant Period") by urging his subordinates to ship future orders ahead of schedule and report the revenue early.  Recognizing revenue for early shipments jeopardized RTI's ability to meet its revenue guidance for future quarters and alienated its customers, who demanded discounts to accept product early and reduced their subsequent orders, putting RTI further behind its aggressive revenue projections.  Hutchison then repeatedly misled the market, in both RTI's periodic filings and his own public statements, to conceal the truth behind RTI's seemingly robust revenues.

2.      Throughout 2015, Hutchison approved a series of aggressive quarterly revenue targets that RTI announced to investors and the market.  Hutchison knew that he would receive

1

bonus compensation in the form of cash and stock awards if RTI hit its revenue targets. But Hutchison found RTI repeatedly unable to reach its revenue targets with sales from the quarter. Desperate to reach his targets, Hutchison urged his managers to ship products that were not due to be sent until the next quarter — weeks or months in advance. By recognizing revenue for these orders in the quarter they were shipped, not the quarter when RTI's customers wanted them to be delivered, RTI found a way to show investors that it had met its revenue targets. But this practice of "pulling forward" revenue merely postponed the inevitable. RTI found it more and more difficult to meet its quarterly guidance as it stripped more and more revenue from future quarters.

3.     In 2016, Hutchison faced a cascade of problems that placed his position as CEO in jeopardy. Although he had publicly announced an ambitious goal of achieving $500 million in annual revenue, RTI's reported revenue was only $282 million in 2015. Hutchison's allies on the Board of Directors resigned, and when the next Chairman of the Board was selected, Hutchison was passed over. An influential Board member unexpectedly announced that he would not support an acquisition championed by Hutchison. And an RTI investor launched a proxy fight, blaming Hutchison for RTI's poor financial performance. In the midst of these challenges, RTI's stock price dropped to a two-year low in Q1 2016.

4.     At Hutchison's direction, RTI continued to scour its order books at quarter-end for orders that were scheduled to be delivered in future quarters, to ship those orders early, and then to book the revenue in the current quarter. Although Hutchison knew that RTI was depleting future orders, angering customers, and in some instances violating accounting rules, he publicly and falsely attributed RTI's apparent success to growth in orders, claiming that RTI had

benefited from "higher-than-expected orders," "industry consolidation," or orders that "just keep coming in."

5.      Hutchison was ultimately unable to save his job.  In August 2016, at the request of RTI's Board of Directors, Hutchison announced his resignation.  In December 2016, he formally stepped down.

6.      On March 16, 2020, following the start of an investigation by the SEC, RTI announced that it would begin an internal investigation into its "revenue recognition practices regarding the timing of revenue."  Over the next two days, RTI's stock price dropped more than 27%, from $2.75 to $1.99.  RTI's investigation culminated in a five-year restatement, issued in June 2020.  In its restatement, RTI acknowledged improperly recognizing revenue for shipments sent early to customers without advance approval.  RTI also determined that its disclosure controls and procedures were ineffective and that there were material weaknesses in its internal controls over financial reporting.

7.      Hutchison has not reimbursed RTI for the bonuses and other incentive- and equity-based compensation he received from RTI, or for his substantial profits from sales of RTI stock after he left RTI.

8.      By engaging in the misconduct described herein, Hutchison violated antifraud, internal accounting controls, and books-and-records provisions of the Securities Exchange Act of 1934 ("Exchange Act"), Securities Act of 1933 ("Securities Act"), and Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act"), and the rules thereunder, and he aided and abetted violations by RTI.

9.      The SEC seeks injunctive relief, civil penalties, disgorgement, a reimbursement to RTI of Hutchison's incentive-based compensation and profits from his sales of RTI stock, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

11.      Venue is proper in this Court pursuant to Section 22(a) and (c) of the Securities Act [15 U.S.C. § 77v(a), (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. § 78aa(a), (b)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the District of Columbia.  Hutchison and RTI filed with the SEC in this judicial district multiple materially false and misleading documents. Additionally, Hutchison made false and misleading statements and omissions in at least five different Forms 8-K that were filed with the SEC in this judicial district.

12.     Hutchison, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANT

13.     **Brian K. Hutchison ("Hutchison")**, age 63, resides in Asheville, North Carolina.  Hutchison served as RTI's Chief Executive Officer and as a member of its Board of Directors from 2001 through December 2016, when he left RTI.  As RTI's CEO, Hutchison

signed each of RTI's Forms 10-Q and Forms 10-K and participated in each of RTI's earnings

calls during the Relevant Period.

## OTHER RELEVANT ENTITY

14.    The following entity relevant to this action has been charged by the SEC in a

separate action and proceeding:  **Surgalign Holdings, Inc.** (formerly known as **RTI Surgical**

**Holdings, Inc.** and **RTI Surgical, Inc.** ("**RTI**")) is a Delaware corporation with its principal

place of business in Deerfield, Illinois.  During the Relevant Period, RTI's common stock was

registered with the SEC pursuant to Section 12(b) of the Exchange Act and traded on the

NASDAQ exchange, under the symbol "RTIX."

## BACKGROUND

### A.  RTI Manufactured, Sold, and Shipped Medical Products to Large Distributors.

15.    RTI manufactured and sold surgical implants, such as orthopedic and spinal

implants.  Its Commercial division, which generated a significant portion of RTI's revenue,

primarily sold RTI's products to large distributors for resale.

16.    RTI's Commercial division primarily relied on advance orders from major

customers, which typically placed orders three months in advance of their requested delivery

dates.  This gave RTI considerable visibility into its book of future orders.  RTI's customers

specified their delivery dates based on their predictions of the demand for RTI's products, their

capacity to inspect and store the RTI products, and other factors.

17.    RTI typically recognized revenue upon shipment of its products.  Under

Generally Accepted Accounting Principles ("GAAP"), and specifically Accounting Standards

Codification ("ASC") 605-15, which was in effect during the relevant period, RTI was required

to satisfy four elements at the time it recognized revenue: (1) there must be persuasive evidence

of an arrangement; (2) collectability must be reasonably assured: (3) delivery must have

occurred, meaning that the customer must have taken title and assumed the risks and rewards of ownership; and (4) the price must be fixed or determinable.  Until all four elements of ASC 605-15 were satisfied, RTI was not permitted to recognize revenue for a transaction.

18.     Under Item 303(a) of Regulation S-K [17 C.F.R. § 229.303(a) (2011)], which was issued under Section 13(a) of the Exchange Act, the Management's Discussion and Analysis ("MD&A") sections of RTI's Forms 10-K and 10-Q were required to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income."  The MD&A was also required to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations," as well as "any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

19.     Instruction 3 to Item 303(a) of Regulation S-K required that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. § 229.303(a).  Item 303(b) of Regulation S-K required discussion in quarterly reports on Form 10-Q of material changes in such known trends or uncertainties.  17 C.F.R. § 229.303(b).

20.     The SEC has previously stated that the MD&A is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company."  Securities Act Release No. 6711 (Apr. 17, 1987).  The Commission further stated, in a 2003 MD&A interpretive release: "[o]ne of the most important elements necessary to an understanding of a company's performance . . . is the

discussion and analysis of known trends . . . and uncertainties." Companies should consider whether information available to them "may reveal a trend or general pattern in activity" or "an uncertainty." Moreover, the Commission emphasized, when companies describe trends or uncertainties, their analysis "should reveal the underlying material causes of the matters described," and companies "should consider including, and may be required to include, an analysis explaining the underlying reasons or implications, [or] interrelationships between constituent elements." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations (Dec. 19, 2003), *available at* http://www.sec.gov/rules/interp/33-8350.htm. The Commission also stated that the MD&A should describe "unusual or non-recurring items" about which disclosure was "necessary for investors to ascertain the likelihood that past performance is indicative of future performance."

21.     RTI's Forms 10-K and 10-Q were also required to contain "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).

22.     RTI's reliance on pull-forwards, including unauthorized early shipments, disguised RTI's true business performance and resulted in known uncertainties for RTI's business and future revenue and profits that RTI and Hutchison did not disclose. The use of pull-forwards cannibalized future sales and resulted in revenue shortfalls in future quarters, which RTI filled with additional pull-forwards. RTI and Hutchison did not disclose that RTI was using early shipments to address revenue shortfalls, that RTI did not have enough orders to achieve its quarterly revenue guidance without using pull-forwards, or that earlier pull-forwards had significantly reduced the amount of available future orders. Nor did RTI or Hutchison disclose that RTI was recognizing revenue prematurely for unauthorized early shipments in violation of

GAAP, or that unauthorized early shipments made up an increasingly large proportion of RTI's total early shipments over time. RTI and Hutchison also failed to disclose that RTI's use of pull-forwards jeopardized RTI's future revenue streams when its most significant customers imposed restrictions on future early shipments, and required RTI to agree to substantial discounts or forgo annual fee increases to convince customers to accept pull-forwards. Further, RTI and Hutchison did not disclose the use of a material one-time transaction to help achieve its revenue guidance, even when that transaction made past performance unlikely to be indicative of future performance.

23.     As RTI's CEO, Hutchison was required to certify that each of RTI's Form 10-Q and Form 10-K filings "fully complies with the requirements of section 13(a)" of the Exchange Act, "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and "fairly presents, in all material respects, the financial condition and results of operations of the issuer." 18 U.S.C. § 1350; 17 C.F.R. §§ 240.13a-14, 229(b)(31). Hutchison falsely certified that there were no untrue statements of material fact or omissions of material fact in RTI's Forms 10-Q and 10-K, and that those reports fairly presented, in all material respects, RTI's financial condition and results of operations, when he knew that RTI had failed to disclose its reliance on pull-forwards to achieve its revenue guidance.

### B. Hutchison, RTI's Experienced CEO, Urged Managers to Pull Forward Revenue From Shipments to Meet His Aggressive Revenue Targets.

24.     Hutchison became RTI's CEO in 2001 after a twenty-year career in corporate management and finance, including roles as Controller, Vice President of Finance, Division President, and Chief Operating Officer at a large medical technology company.

25.     As RTI's CEO, Hutchison was deeply involved in RTI's business and financials, and worked to transform RTI's business and strategy.  He familiarized himself with RTI's financial statements, and developed initiatives to expand RTI's lines of business and grow the company through acquisitions, new product development, and outside investment.

26.     Each quarter during the Relevant Period, RTI provided guidance to investors regarding its revenue expectations, analysts published expectations for RTI's quarterly revenue, and analysts reported on whether RTI had achieved its revenue guidance and analyst revenue expectations.  As CEO, Hutchison encouraged his senior managers to shift, or "pull forward," revenue from future quarters, typically by shipping orders earlier than customers had originally requested, as a means of achieving RTI's public revenue guidance, analyst revenue estimates, and internal revenue targets.

27.     Adopting the euphemism "order book management" to refer to the practice of pull-forwards, Hutchison regularly participated in discussions about RTI's use of pull-forwards, including during his weekly staff meetings.  Hutchison set unrealistic revenue targets and did not establish effective internal accounting controls, pushing employees to ship large quantities of product without ensuring that they first obtained and documented customer approval.

28.     Although RTI sometimes requested customer permission to ship orders early, at other times RTI sent large quarter-end early shipments without customer approval.  RTI sent unauthorized early shipments to each of its major customers in 2015 and 2016.  Each of those customers responded by instructing RTI to stop sending early shipments.  Hutchison knew that customers were protesting, but did not take any steps to ensure that RTI only sent shipments with customer approval, or to ensure that RTI only recognized revenue for shipments that had been sent with customer approval.

29.     Hutchison created an environment in which employees understood that they should prioritize the achievement of revenue targets over adhering to the acceptable delivery windows specified in customer orders.  Specifically, although RTI employees were concerned that continuing to ship early would damage RTI's relationships with important customers, Hutchison instructed his employees to continue early shipments to address revenue shortfalls, and insisted that RTI needed to continue with this practice of "order book management." Hutchison also rejected conservative budgets prepared by his employees, instead insisting that his employees prepare budgets that would allow RTI to achieve predetermined revenue targets, including an unrealistic annual revenue target of $500 million that Hutchison had announced.

## HUTCHISON'S MISSTATEMENTS, OMISSIONS, AND MISCONDUCT

### A.     Hutchison Concealed RTI's Improper Use of Pull-Forwards From Investors.

30.     Hutchison knew that RTI was underperforming during the Relevant Period and was relying on pull-forwards to achieve its revenue guidance and meet analysts' estimates of RTI revenue, and that pull-forwards thus constituted a significant component of RTI's revenues.  He knew that RTI's use of pull-forwards meant that RTI was cannibalizing and creating uncertainties in future revenue and creating a constant cycle of dependence on pull-forwards.  He knew that pulling forward revenue from RTI's Commercial division helped to mask poor performance by RTI's other businesses.  And he knew that, under GAAP, RTI should not ship orders early without customer approval or recognize revenue for unapproved shipments.

31.     Despite this knowledge, Hutchison misled investors in RTI's SEC filings and earnings calls throughout the Relevant Period about the reasons for RTI's apparent successes, and hid the truth about RTI's condition and the risks and uncertainties that the pull-forwards posed to RTI's future revenue and business with its largest customers.  Hutchison did not disclose that RTI did not have enough orders to meet its revenue guidance and analyst revenue

10

estimates each quarter without pulling in transactions scheduled for delivery in future periods. Nor did he disclose that RTI repeatedly needed to borrow from future quarters to address that gap, in part because RTI had depleted its orders through earlier pull-forwards. Hutchison did not disclose the risks and uncertainties created by RTI's reliance on early shipments, including that its major customers had all told RTI to stop engaging in these practices, that RTI was draining orders from future quarters, and that its customers were reducing their orders because RTI was sending them more inventory than they could resell. The lengths to which Hutchison went to have RTI hit its revenue targets illustrates just how important these targets were to the market.

32.    By disguising the company's true business performance and cannibalizing future sales, RTI's use of pull-forwards created an uncertainty or event that was known to Hutchison, that was reasonably expected to have a material effect on RTI's future revenue, and that caused reported financial information not to be necessarily indicative of future operating results. Likewise, RTI's quarterly earnings releases, filed as exhibits to RTI's current reports, stated that RTI's revenues had exceeded its revenue guidance without disclosing the use of or effect of pull-forwards, thereby rendering the disclosures misleading.

i.    In 2015, Hutchison Concealed RTI's Growing Reliance on Pull-Forwards.

33.    On February 27, 2015, RTI's CFO told Hutchison that RTI had begun showing "not a good trend" of generating a disproportionate amount of its revenue at the end of each quarter. The next day, February 28, 2015, Hutchison learned that RTI was likely to fall short of its Q1 revenue guidance, both because of shortfalls in its international sales and because RTI had already shipped a large portion of its Q1 2015 orders the previous quarter. On March 23, 2015, Hutchison was informed that RTI was planning to pull forward sales from Q2 2015 to achieve RTI's revenue guidance for Q1.

34.     RTI employees examined the orders received for delivery in Q2 2015, determined which orders RTI could satisfy with its available inventory, and then shipped those orders early to help boost RTI's Q1 revenue and compensate for the shortfalls. RTI only met its revenue guidance and analyst revenue estimates for Q1 because it had pulled forward $5.8 million in future orders under Hutchison's direction and oversight.

35.     Hutchison knowingly, recklessly, or negligently hid RTI's reliance on pull-forwards from investors. On April 23, 2015, during RTI's Q1 2015 earnings call, he was specifically asked what was "driving the growth" in RTI's business. In response, Hutchison said that RTI's "really strong growth" was continuing, and "the orders from our commercial partners just keep coming in."

36.     That same day, RTI filed a press release with the Commission announcing RTI's Q1 2015 earnings, as an attachment to a Form 8-K. In that press release, Hutchison said, "We saw solid growth in the first quarter, exceeding our expectations and keeping us on track for the year. . . . Based on results from the first quarter, I am confident in our ability to meet our goals for the year."

37.     As Hutchison knew or was reckless or negligent in not knowing, increased orders alone did not account for the increase in RTI's reported revenue. Hutchison knew or was reckless or negligent in not knowing that RTI only met its revenue guidance by stripping sales away from Q2. Hutchison's statements were half-truths that created the false and misleading impression that RTI had achieved its revenue guidance because of growth in orders, rather than RTI's aggressive efforts to pull in sales from the future.

38.     Hutchison signed RTI's Form 10-Q for Q1 2015, which RTI filed with the Commission on May 4, 2015. In that filing, Hutchison knowingly, recklessly, or negligently

failed to disclose RTI's reliance on pull-forwards, namely that customer orders were not growing sufficiently to allow RTI to hit its revenue targets without the use of pull-forwards, and the risks and uncertainties created by RTI's reliance on pull-forwards, specifically the risk and uncertainty that the company would not meet its revenue targets in future quarters because it had already booked revenue it planned to recognize in Q2. Furthermore, although the Form 10-Q stated that period-over-period revenue comparisons (which were provided in the MD&A portion of the filing) could be affected by variations in the timing of orders from its commercial customers, Hutchison and RTI misleadingly omitted to state that pull-forwards, rather than merely customer orders, were also affecting the amount of revenue that RTI was reporting during these periods.

39.    Hutchison and RTI made material misrepresentations regarding RTI's Q1 2015 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading. Reasonable investors would have wanted to know that RTI was only able to achieve its quarterly revenue guidance and analyst revenue estimates by pulling forward sales from Q2. Reasonable investors would also have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets.

40.    In Q2 2015, Hutchison learned that RTI was again likely to fall short of its quarterly guidance. At Hutchison's weekly staff meetings with senior management and at other times, his subordinates briefed him on potential pull-forwards, as well as the specific pull-forwards that RTI was pursuing or had already shipped to specific customers. Hutchison therefore was fully informed as to the ongoing issues with RTI's revenues and was deeply involved in the ongoing manipulation of RTI's orders.

41.    On April 18, 2015, Hutchison received an e-mail explaining that one of RTI's largest customers, after receiving an unauthorized early shipment from RTI, had made it "abundantly clear" that RTI should not "ship early" again.  The e-mail also told Hutchison that following this direction could result in RTI missing its Q2 forecasts because RTI had planned to pull forward that customer's Q3 orders.

42.    On June 4, 2015, Hutchison received an e-mail stating that RTI was falling short of its quarterly guidance.  On June 26, 2015, Hutchison sent an e-mail to his senior managers announcing that although the Commercial division had already "stepped up big this quarter to offset shortfalls" by using early shipments, they still had "a long way to go" to achieve the Q2 forecast and should "accelerate" their sales.

43.    RTI met its Q2 2015 revenue guidance and analyst revenue estimates only by pulling forward $6.2 million of future orders, including shipments sent early to customers without their approval.  Hutchison knew or was reckless or negligent in not knowing that RTI was only able to meet revenue targets by manipulating orders and pulling forward revenue from future quarters.  Hutchison knowingly, recklessly, or negligently failed to disclose RTI's reliance on pull-forwards to achieve its Q2 revenue guidance, and the risks and uncertainties associated with that practice.

44.    In its earnings release for Q2 2015, which RTI filed with the Commission as an attachment to a Form 8-K on July 30, 2015, RTI announced that its quarterly revenues had "exceed[ed] guidance," and quoted Hutchison saying, "'Our results for the second quarter were strong with revenues and earnings exceeding our expectations.'"  In that filing, Hutchison knowingly, recklessly, or negligently omitted to state that RTI had only exceeded its revenue guidance and analyst expectations by relying on pull-forwards, creating the false and misleading

impression that RTI's reported revenues accurately reflected its actual performance in the quarter.

45.    Hutchison signed RTI's Form 10-Q for Q2 2015, which RTI filed with the Commission on July 31, 2015.  In that filing, Hutchison knowingly, recklessly, or negligently failed to disclose the underlying trends that were causing RTI to rely on pull-forwards, including that customer orders were not growing fast enough to allow RTI to meet revenue projections without pull-forwards.  He also knowingly, recklessly, or negligently failed to disclose the risks and uncertainties created by RTI's reliance on pull-forwards, including that RTI might not meet revenue projections in future periods because it had already recognized revenue initially planned for Q3 and that RTI might alienate its customers by shipping product outside the requested delivery window.  Indeed, the Form 10-Q specifically stated that there had been "no material change" in the risk factors that RTI had disclosed in its 2014 Form 10-K, which was filed on March 4, 2015.  The 2014 Form 10-K noted the risk that the company could "fail to maintain existing strategic relationships" with distributors, but did not disclose that the company's pull-forward practice was exacerbating that risk.  Furthermore, although the Form 10-Q stated that period-over-period revenue comparisons (which were provided in the MD&A portion of the filing) could be affected by variations in the timing of orders from its commercial customers, Hutchison and RTI misleadingly omitted to state that pull-forwards, rather than merely customer orders, were affecting the amount of revenue that RTI was reporting during these periods.

46.    Hutchison and RTI made material misrepresentations regarding RTI's Q2 2015 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading.  Reasonable investors would have wanted to know that RTI was only able to achieve its quarterly revenue guidance and analyst

revenue estimates by pulling forward sales from Q3, and that the amount of revenue being pulled forward had increased from Q1 to Q2. Reasonable investors would have also wanted to know that RTI was recognizing revenue prematurely for unauthorized early shipments, in violation of GAAP, and that these practices were harming customer relationships. Moreover, reasonable investors would have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets.

47.    Hutchison approved revenue guidance for Q3 2015 at a level that he was told "does not leave us much breathing room." As in Q2, Hutchison was regularly informed about the amount of pull-forwards, both at his staff meetings during the quarter and in a quarter wrap-up memorandum he received shortly after the quarter. When RTI's Q3 sales again fell short of expectations, Hutchison wrote in an e-mail to his managers that this was "really unacceptable" and that they should use early shipments to bridge the gap to RTI's revenue guidance and "deliver on our commitment to the street." In a September 17, 2015 e-mail, Hutchison wrote that he had "talked with most of the revenue folks" and warned his managers that "[w]e would all be better off" if RTI did not disappoint investors by falling short of its revenue guidance.

48.    To achieve its guidance, RTI shipped $8.4 million of orders that customers had placed for delivery in future quarters. This included a $2 million early shipment sent to a customer at the end of the quarter without the customer's approval. That customer e-mailed RTI complaining about the unauthorized early shipment because it had caused the customer's "inventory levels [to] go sky high," and directed RTI "to not ship ANYTHING early without prior approvals." Even though the customer had not approved the Q3 2015 delivery, RTI recognized revenue for that shipment in Q3 2015, in violation of GAAP.

49.     Those pull-forwards were not enough to close RTI's gap to its Q3 2015 revenue guidance and analyst revenue estimates.  With Hutchison's knowledge, RTI negotiated with another major customer to accept a large early shipment worth $2.5 million, but that customer refused to accept the shipment because it already had an "overstock," which Hutchison understood was problematic.  RTI fell short of its guidance by the same $2.5 million it had unsuccessfully sought to pull forward, showing how dependent it had become on early shipments under Hutchison's direction.

50.     The market's reaction to RTI's failure to meet its revenue target was swift and dramatic.  At the close of trading on October 28, 2015, RTI's stock price was $5.07.  RTI announced its Q3 2015 earnings prior to the market opening on October 29, 2015.  RTI's stock price closed that day at $4.40 — a drop of 13.2%.

51.     Hutchison knew or was reckless or negligent in not knowing that RTI would have fallen even further short of its revenue targets if it had not manipulated its order book and pulled future revenues into Q3.

52.     Hutchison signed RTI's Form 10-Q for Q3 2015, which RTI filed with the Commission.  In the Form 10-Q, Hutchison knowingly, recklessly, or negligently failed to disclose the uncertainty caused by RTI's reliance on pull-forwards, including that customer orders were not growing fast enough to keep up with RTI's revenue targets, and the risks created by RTI's reliance on pull-forwards, including that RTI might not be able to meet revenue targets in future quarters because it had already recognized certain revenues planned for future periods and that RTI was alienating its customers with its practice of shipping product outside requested delivery windows.  Indeed, the Form 10-Q specifically stated that there had been "no material change" in the risk factors that were disclosed in the 2014 Form 10-K — including the risk that

the company could "fail to maintain existing strategic relationships" with distributors — and did not disclose that the company's pull-forward practice was exacerbating that risk. Furthermore, although the Form 10-Q stated that period-over-period revenue comparisons (which were provided in the MD&A portion of the filing) could be affected by variations in the timing of orders from its commercial customers, RTI did not disclose that the pull-forwards, rather than merely customer orders, were affecting the amount of revenue that RTI was reporting during these periods.

53.     Hutchison and RTI made material misrepresentations regarding RTI's Q3 2015 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading. Reasonable investors would have wanted to know that RTI was recognizing revenue prematurely for unauthorized early shipments, in violation of GAAP, and that these practices were harming customer relationships. Reasonable investors would also have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets.

54.     Under Hutchison's leadership, pull-forwards continued in Q4 2015. RTI not only shipped products early in Q4 2015, it offered discounts and sacrificed ongoing consignment payments in order to meet short-term revenue targets. Without the use of unauthorized early shipments, other pull-forwards, and a large one-time transaction that accelerated revenue into Q4 2015, RTI would not have achieved its revenue guidance or analyst estimates for Q4 2015 or fiscal year 2015.

55.    Hutchison recognized that RTI was in a weakened position.  In a December 8, 2015 e-mail, Hutchison described RTI's Commercial business as a "train wreck" and described its Dental business as "not as strong as we like to think it is."

56.    RTI sent $4 million in early shipments to customers in Q4 2015 as part of its effort to meet its year-end revenue guidance.  This included a $1.4 million shipment of goods that a major customer had asked to be delivered in Q1 2016.  That shipment was sent early without the customer's approval, but RTI nonetheless recognized revenue for that shipment in Q4 2015 in violation of GAAP.  Upon receiving that shipment, the customer objected to RTI and insisted that RTI specifically obtain the customer's approval before sending any future shipments.

57.    In a January 13, 2016 e-mail, Hutchison was told about this new customer directive, that it was a "response" to RTI's shipping activity in December 2015, and that this directive could make it more difficult for RTI to achieve revenue targets in the future because RTI was planning to pull forward additional sales to that customer in Q1 2016.  Hutchison was also warned that RTI might need to consider "discounts" to ensure that the customer would accept early shipments.  Despite knowing of this unauthorized early shipment, Hutchison did not take any steps to address RTI's premature recognition of revenue in 2015 or to ensure that RTI received customer approval before sending out early shipments.

58.    RTI also relied on a one-time $7.2 million transaction with a major customer to meet its year-end revenue guidance in 2015.  That customer agreed to RTI's suggestion of the one-time transaction in lieu of making ongoing payments under an existing consignment arrangement.  This $7.2 million transaction reflected a substantial discount from the pricing that RTI and the customer had previously agreed to, and eliminated future sales under the

consignment arrangement.  In other words, RTI, acting at Hutchison's direction, pulled forward into Q4 2015 revenues associated with the consignment arrangement that would have otherwise been recognized in future quarters, and in so doing reduced the total revenues that RTI would ever recognize associated with the arrangement.

59.    In its earnings release for Q4 2015, which RTI filed with the Commission as an attachment to a Form 8-K on January 8, 2016, Hutchison said, "We are pleased that revenues of $76.1 million in the fourth quarter exceeded our guidance of $68 million to $69 million."  He also said, "In the fourth quarter, we benefitted from stronger than expected orders from certain commercial distributors.  As we have mentioned in prior quarters, the commercial business is less predictable on a quarterly basis due to the timing of distributor orders."  That statement was materially misleading.  Hutchison knowingly, recklessly, or negligently omitted to also state that RTI had only exceeded its revenue guidance by relying on pull-forwards and a one-time transaction, rather than simply "stronger than expected orders," and that RTI's own actions, not just "the timing of distributor orders," were affecting the amount of revenue that RTI was reporting for Q4 2015.

60.    Hutchison learned from an internal memorandum he received that was dated January 18, 2016 that RTI had achieved better-than-expected results in 2015 because of "order book management" (i.e., early shipments), and that this practice had resulted in "unfavorable revenue variances" in certain lines of business and smaller orders from one of RTI's most important customers.

61.    On the Q4 earnings call, which was held on February 16, 2016, Hutchison misleadingly attributed RTI's seemingly strong performance in Q4 2015 to "higher-than-expected orders" and "industry consolidation."  But he misleadingly omitted to also disclose the

use of pull-forwards and their effect on RTI's 2015 revenue, including the effect of the significant one-time transaction on RTI's future revenues. In that same earnings call, in marked contrast to his scathing internal December e-mail in which he called the Commercial division a "train wreck" and the Dental division "not as strong as we'd like to think," Hutchison told investors that "our [C]ommercial business...did extremely well this year" and touted "higher-than-expected orders" in the Dental business.

62.    In the final earnings release for Q4 2015 and FY 2015, which RTI filed with the Commission as an attachment to a Form 8-K on February 16, 2016, Hutchison said, "During 2015, we executed on all our value drivers and delivered strong annual growth of 7 percent." In simply touting RTI's annual growth, Hutchison misleadingly omitted to also disclose the use of and effect of pull-forwards, and the underlying uncertainty that such use was creating.

63.    Hutchison signed RTI's Form 10-K for 2015, which RTI filed with the SEC on March 7, 2016. This Form 10-K specifically stated that a "fail[ure] to maintain existing strategic relationships" with distributors could lead to a "material decrease in revenue," but did not disclose the use of pull-forwards or that Hutchison's consistent emphasis on pull-forwards was already causing growing customer discontent and was jeopardizing the very relationships that were central to RTI's business. Nor did the Form 10-K disclose the uncertainty that the use of pull-forwards was creating for future revenue, or the fact that RTI had pulled forward increasing amounts in each quarter of 2015. The filing also did not disclose the risks and uncertainties created by RTI's reliance on pull-forwards, including that the company might not meet guidance in future periods because it had already recognized certain revenues planned for those periods and that the practice risked alienating key customers. Furthermore, although the Form 10-K stated that period-over-period revenue comparisons (which were provided in the MD&A portion

of the filing) could be affected by variations in the timing of orders from its commercial customers, RTI and Hutchison misleadingly omitted to also state that the pull-forwards, rather than merely customer orders, were affecting the amount of revenue that RTI was reporting during these periods. The Form 10-K also did not contain any discussion of the one-time $7.2 million transaction, even though it was a significant component of RTI's Q4 2015 revenues and was an unusual, infrequent, and non-recurring transaction that materially affected RTI's reported income and about which disclosure was necessary for investors to understand that RTI's performance in 2015 would not be indicative of its future performance.

64.     Hutchison knew or was reckless or negligent in not knowing that RTI was more reliant than ever on manipulating future orders to meet revenue targets and was sacrificing future revenue and customer satisfaction in order to meet its short-term revenue goals. In not revealing the pull-forwards that allowed RTI to meet its revenue targets, Hutchison hid the truth about RTI's business, rather than allowing investors to see "through the eyes of management." Hutchison also knew or was reckless or negligent in not knowing that he viewed RTI's Commercial business — a significant source of company revenue — as a "train wreck," but did not disclose this to investors.

65.     Hutchison and RTI made material misrepresentations regarding RTI's Q4 2015 and full-year 2015 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading. Reasonable investors would have wanted to know that RTI was only able to achieve its quarterly and annual revenue guidance and analyst revenue estimates by pulling forward sales from Q1 2016 and accelerating revenue through a one-time transaction. Reasonable investors would have also wanted to know that RTI was recognizing revenue prematurely for unauthorized early

shipments, in violation of GAAP, and that these practices were harming customer relationships. Reasonable investors would have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets. Moreover, reasonable investors would have wanted to know that RTI's customer relationships were being damaged by RTI's use of "order book management" (including because damaged relationships could lead to a material decrease in revenue, as RTI's own filings acknowledged) and that RTI's own CEO viewed a major part of the company as a "train wreck." Reasonable investors would also have wanted to know that RTI had achieved its revenue guidance in part because of a one-time transaction that jeopardized RTI's future revenues.

        ii.    <u>In 2016, Hutchison Concealed Growing Customer Dissatisfaction and RTI's Continued Reliance on Pull-Forwards to Meet Revenue Targets.</u>

66.     In Q1 2016, Hutchison faced another quarter of disappointing performance amid pressure to grow RTI's revenue. Hutchison knew that RTI's continued use of pull-forwards and "order book management" could diminish future revenue. Nevertheless, he again allowed RTI to improperly recognize revenue in Q1 2016 for a large unauthorized quarter-end early shipment. Hutchison concealed the fact that without this shipment and other pull-forwards totaling $3.3 million, RTI would not have achieved its revenue guidance and analyst expectations for Q1 2016. Hutchison also continued to conceal RTI's reliance on pull-forwards from the market.

67.     On March 22, 2016, Hutchison was told that, as a result of a major customer's decision to reject RTI's offer of an unusually large discount to accept a $1 million early shipment in Q1 2016, RTI would "have no buffer" if certain divisions "miss[ed]" their revenue targets. In a March 22 e-mail to his senior managers, Hutchison emphasized that "[t]here is no cushion, no room for error. We need to hit the guidance, at a minimum."

68.    At the end of Q1 2016, RTI employees sent a $1.6 million shipment to another major customer several weeks early.  RTI never sought or obtained the customer's authorization for the early shipment; RTI employees instead decided that they would "not seek[] authorization" and that, as a senior manager wrote on March 17, 2016, they would "ship and deal with any issues later."

69.    RTI employees identified orders in which the customer had specified delivery dates from April 11 through June 2, 2016, and shipped those orders on March 29, in violation of the customer's purchase orders and RTI's contract with the customer.  On April 1, the customer contacted RTI to object to this early shipment, because the order had been delivered early without customer authorization, and the customer lacked the storage or processing capacity to receive this shipment early and properly inspect it.

70.    In an April 4, 2016 e-mail, RTI employees informed Hutchison that the customer was "pretty upset about the amount of product we shipped at quarter end" and that the customer was "contemplating returning" the early shipments.  That same day, Hutchison responded that he was "aware" of the situation and was "[h]oping not to have any return."  Hutchison also learned that the customer insisted that it "pre-approv[e]" any further early shipments.

71.    During RTI's quarterly closing process, Hutchison was kept regularly updated on the discussions with the customer.  He knew that RTI had "still not gotten a response" from the customer to RTI's offers of a discount.  RTI employees told Hutchison that they had told the customer that RTI needed a response so that RTI could "close the books on the quarter and this is the last piece of information needed by Accounting."  Hutchison told them instead "to be careful not to push too hard" for a definitive response from the customer because, "[a]s time goes by, this is [in] your favor."  Hutchison admits that this interaction showed that RTI's relationship

with this customer was "broken" in a "pretty severe" way.  The customer did not accept the

shipment, or inform RTI that it would be accepting the shipment, until late in April 2016, after

RTI had closed its books for Q1 2016.

72.     Because the return and re-shipment process would have taken too long, RTI's

customer was unable to return the shipment to RTI for re-delivery on the requested dates.  The

customer was therefore ultimately forced to accept the shipment in late April.  However, this

large, early shipment overwhelmed the customer's warehousing and processing facility, resulting

in a months-long delay in processing and inspecting the shipment.  RTI did not receive payment

for the shipment until months later, in Q3 2016, well after the customer's usual payment

schedule.  RTI also performed poorly on the customer's performance metrics.  Sales to that

customer for the next two quarters were lower than previously forecasted.

73.     Hutchison did not disclose to investors that RTI had relied on this and other

early shipments to achieve its revenue guidance, or the uncertainty such a practice created for

future revenues.  In its earnings release for Q1 2016, which RTI filed with the Commission as an

attachment to a Form 8-K on April 28, 2016, RTI announced that its revenue had "exceed[ed]

company guidance" for the quarter, and Hutchison said, "Results for the quarter were in line with

our outlook."  In that filing, Hutchison knowingly, recklessly, or negligently omitted to also state

that RTI had only exceeded its revenue guidance by relying on prematurely recognized revenue

for a large unauthorized early shipment, as well as other pull-forwards, creating the misleading

impression that RTI's reported revenues did not come at the expense of performance in future

quarters.

74.     Hutchison signed RTI's Form 10-Q for Q1 2016, which RTI filed with the

Commission on May 4, 2016.  In that filing, Hutchison knowingly, recklessly, or negligently

failed to disclose the growing number of customers who refused to accept RTI's early shipments or only agreed to take product early if they received a significant discount, and the associated risks and uncertainties, including that RTI might not be able to achieve its future revenue guidance.  Hutchison also knowingly, recklessly, or negligently failed to disclose the risks and uncertainties created by RTI's reliance on pull-forwards.  Indeed, the Form 10-Q specifically stated that there had been "no material change" in the risk factors that were disclosed in the 2015 Form 10-K — including the risk that the company could "fail to maintain existing strategic relationships" with distributors — and did not disclose that the company's pull-forward practice was exacerbating that risk.  Furthermore, although the Form 10-Q stated that period-over-period revenue comparisons (which were provided in the MD&A portion of the filing) could be affected by variations in the timing of orders from its commercial customers, RTI did not disclose that the pull-forwards, rather than merely customer orders, were affecting the amount of revenue that RTI was reporting during these periods.

75.     At an investor conference held from May 23 to May 25, 2016, Hutchison presented a slide deck that stated that RTI had "solid relationships and favorable contracts" with its commercial distributors and that its commercial business was "[f]ocused on customer service and maintaining relationships" and featured "[l]ong term contracts, [and] sustainability."  The deck also listed "[o]ptimize commercial business" among RTI's "Key Value Drivers." Hutchison omitted to state the ongoing harm to RTI's commercial relationships and commercial business that was being caused by its reliance on pull-forwards.

76.     At the same investor conference, Hutchison reiterated that RTI had $282.3 million in revenue in 2015.  He omitted to state that this revenue figure included millions in 2016 revenue that had been pulled forward into 2015.

26

77.     Hutchison knew or was reckless or negligent in not knowing that RTI was reliant on pull-forwards to meet its revenue targets and that RTI was sacrificing its customer relationships and future sales in order to meet its short-term goals.

78.     Hutchison and RTI made material misrepresentations regarding RTI's Q1 2016 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading.  Reasonable investors would have wanted to know that RTI was only able to achieve its quarterly revenue guidance and analyst revenue estimates by pulling forward sales from Q2 2016.  Reasonable investors would have also wanted to know that RTI was recognizing revenue prematurely for unauthorized early shipments, in violation of GAAP, and that these practices were harming customer relationships.  Reasonable investors would have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets.

79.     Hutchison knew or was reckless or negligent in not knowing that RTI's previous dependence on early shipments caused shortfalls in Q2 2016, but he continued to conceal that fact from investors.  An April 14, 2016 memo informed Hutchison that "previous order book management" helped to explain certain divisions' shortfalls in Q1 and Q2.  On July 8, 2016, Hutchison received an e-mail informing him that RTI was forced to adjust its forecasts downward because customers expected to reduce their orders.  These uncertainties in RTI's future revenues resulted in part from RTI's ongoing reliance on pull-forwards, causing customers to have more RTI inventory than they could accommodate.

80.     The analyst consensus estimate for RTI's Q2 2016 revenue was $66.4 million. RTI issued guidance of $66 million.  RTI ultimately reported $67.6 million in revenue, which

included nearly $1.4 million in unauthorized pull-forwards. Thus, without pull-forwards, RTI would have fallen short of the analyst consensus estimate.

81.    During the earnings call for Q2 2016, Hutchison knowingly, recklessly, or negligently downplayed declines in the Commercial business as merely the result of "consolidation among some of our commercial distributors," when, in fact, pushback from RTI's biggest customers on early shipments had resulted in the customers forecasting lower orders.

82.    Hutchison signed RTI's Form 10-Q for Q2 2016, which RTI filed with the Commission on August 4, 2016. In that filing, Hutchison knowingly, recklessly, or negligently failed to disclose the continuing trend of customer resistance to early shipments and the effect of RTI's pattern of reliance on pull-forwards on customer orders. Indeed, the Form 10-Q specifically stated that there had been "no material change" in the risk factors that were disclosed in the 2015 Form 10-K — including the risk that the company could "fail to maintain existing strategic relationships" with distributors — and did not disclose that the company's pull-forward practice had exacerbated that risk.

83.    Hutchison made material misrepresentations regarding RTI's Q2 2016 results and omitted to state material facts necessary, in light of the circumstances under which they were made, to make their statements not misleading. Reasonable investors would have wanted to know that RTI was only able to achieve analyst revenue estimates by pulling forward sales from Q3 2016. Reasonable investors would have also wanted to know that RTI was recognizing revenue prematurely for unauthorized early shipments, in violation of GAAP, and that significant customers were objecting to RTI's practices. Reasonable investors would have wanted to know that the early delivery of products created a potential for a material decline in RTI's future revenue and jeopardized its ability to meet future revenue targets.

**B.** **Hutchison Knowingly, Recklessly, or Negligently Allowed RTI To Repeatedly Violate GAAP.**

84.     Despite being told that customers had not agreed to early shipments, Hutchison repeatedly permitted RTI to recognize revenue for shipments sent without customer approval, in violation of GAAP.

85.     In Q3 2015, Hutchison pushed his managers to make early shipments to meet revenue guidance.  RTI employees sent a $2 million shipment early without the customer's approval.  Even though the customer had not approved of the shipment, the order was booked as Q3 revenue in violation of GAAP.

86.     After RTI sent $1.4 million in goods early in Q4 2015, without a customer's approval, Hutchison learned that the customer had complained, and would require RTI to obtain specific approval for every future shipment to that customer.  Again, in violation of GAAP, RTI booked the $1.4 million as revenue in Q4 2015.

87.     Despite knowing that RTI had sent unauthorized early shipments in 2015, Hutchison did not take any actions to prevent future unauthorized early shipments or improve RTI's controls.  Instead, RTI employees sent a $1.6 million unauthorized early shipment in Q1 2016.

88.     RTI booked that $1.6 million as revenue in Q1 2016, in violation of GAAP, even though Hutchison knew that RTI had sent the shipment early without the customer's approval, and that the customer had objected to the shipment.  At the time that RTI recognized revenue for the unauthorized early shipment in Q1 2016, none of the revenue recognition criteria of ASC 605 were satisfied.  First, there was no arrangement with the customer for RTI to make these shipments in Q1 2016, weeks before the dates permitted by the customer's purchase orders and contract with RTI.  Second, collectability was not reasonably assured, because RTI had sent the

shipment early without customer approval, in violation of the customer order, and the customer was considering returning the goods that had been delivered early. Third, the customer had not taken title or assumed the risks and rewards of ownership. Fourth, the price was not fixed or determinable, because RTI had to retroactively offer a discount for the shipment, and did not know whether the customer would accept that offer. Hutchison knew these facts, but nonetheless permitted RTI to recognize revenue for the shipment in Q1 2016.

89.     After learning of the Q1 2016 unauthorized early shipment, Hutchison still did not take any actions to prevent future unauthorized early shipments or improve RTI's controls. RTI employees sent another $1.4 million unauthorized early shipment in Q2 2016 and RTI recognized revenue for that shipment in Q2 in violation of GAAP, even though Hutchison knew that the customer had instructed RTI that it could only ship goods with approval.

90.     As an experienced CEO, Hutchison knew, or was reckless or negligent in not knowing, the GAAP rules related to revenue recognition and that RTI should not recognize revenue for shipments sent to customers early without customer approval.

91.     Hutchison knew RTI's history of unauthorized early shipments to customers, but did not impose controls to ensure that customers agreed to pull-forwards before RTI sent shipments early or recognized revenue for such shipments. Thus, in addition to concealing RTI's use of pull-forwards to meet its revenue targets, as well as the growing problems created by this dependence, Hutchison knowingly, recklessly, or negligently allowed RTI to repeatedly violate GAAP and issue financial statements in its public filings that were not prepared in accordance with GAAP.

92.     RTI lacked controls requiring customer approval of early shipments, and lacked a process for documenting customer approval of early shipments. Rather, RTI employees

typically relied on obtaining verbal approval from customers, which was often not documented. When customers objected to early shipments and indicated that they had not approved early shipments, RTI had no processes in place to ensure that revenue was not recognized prematurely for such shipments.

93.     Hutchison did not disclose that RTI was recognizing revenue in violation of GAAP.  Rather, Hutchison knowingly, recklessly, or negligently made false and misleading statements suggesting that RTI was able to achieve revenue guidance and analyst estimates because of growth in customer orders, rather than RTI's reliance on pull-forwards.

94.     Hutchison signed RTI's Forms 10-K and 10-Q during the Relevant Period in which RTI falsely stated that its consolidated financial statements had been prepared in accordance with GAAP.  In fact, RTI had repeatedly recognized revenue prematurely in violation of ASC 605.

95.     Hutchison also concealed from RTI's auditor that RTI had recognized revenue for unauthorized early shipments.  Hutchison knew, or was reckless or negligent in not knowing, that RTI's accounting records omitted essential details regarding RTI's unauthorized early shipments.  Hutchison signed quarterly management representation letters to RTI's auditor, falsely stating that RTI's financial statements had been prepared and presented in accordance with GAAP.

**C.     After Hutchison's Departure, RTI Announced an Internal Investigation and Restated Its Revenue.**

96.     As a result of Hutchison's misconduct and RTI's continued use of pull-forwards after his departure, and in response to concerns raised by RTI's auditor, RTI announced on March 16, 2020, following the start of an SEC investigation into the matter, that it was

conducting an internal investigation into its "revenue recognition practices regarding the timing of revenue."

97.     Over the next two days, RTI's stock price dropped more than 27%, from $2.75 to $1.99.

98.     RTI was required to restate financial statements issued by RTI under Hutchison's direction in 2015 and 2016.  This restatement was required because of material errors in those financial statements caused by Hutchison's misconduct.

99.     On April 9, 2020, RTI filed an 8-K disclosing that RTI would "restate its previously issued audited financial statements for the years ended December 31, 2014, 2015, 2016, 2017 and 2018 and its unaudited financial statements for the quarterly periods for 2016-2018 and the nine months ended September 30, 2019," a period of time which included the financial statements contained in RTI's SEC filings signed by Hutchison, and which Hutchison certified as accurate and complete.  The same 8-K stated that "investors should no longer rely upon the Company's previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and internal control over financial reporting of the Company's independent registered public accounting firm thereon; or the quarterly financial statements and other financial data released related to" the same period of time.

100.    On June 8, 2020, RTI filed an amended Form 10-K for the fiscal year ended December 31, 2018, which restated its financial statements for the quarterly and annual periods of 2016, 2017, and 2018, and certain financial data, including annual revenues and income, for 2014 and 2015.  Also on June 8, 2020, RTI filed its Form 10-K for the fiscal year ended December 31, 2019, which restated RTI's financial statements for the first three quarterly

periods of 2019.  Those financial statements were contained, as required by federal securities laws, in RTI's Forms 10-K and 10-Q, starting with RTI's 2014 Form 10-K filed on March 4, 2015, and ending with RTI's Q3 2019 Form 10-Q filed on November 7, 2019.

101.    As CEO of RTI, Hutchison signed RTI's 2014 and 2015 Forms 10-K, and the Forms 10-Q filed during 2014, 2015, and the first three quarters of 2016 (among other filings).

102.    During the Relevant Period, RTI offered and sold securities, including selling discounted stock under the company's employee stock purchase plan and issuing shares as compensation to certain employees under its employee incentive plan.

103.    In its restatement, RTI identified and corrected several material errors in its financial statements, including that "revenue for certain invoices should have been recognized at a later date than when originally recognized" because RTI had shipped certain orders "early to customers without obtaining authorized approval" from the customer as required by GAAP.  RTI acknowledged: "[s]ome of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter."  In addition, RTI determined that its disclosure controls and procedures were not effective and that it had material weaknesses in its internal controls over financial reporting.

**D.    Hutchison's False and Misleading Statements Were Made in Connection with the Purchase and Sale of Securities and In the Offer or Sale of Securities, and Hutchison Profited from his Misconduct.**

104.    Hutchison knew that his compensation depended partly on whether RTI achieved its revenue targets.  As a reward for his apparent performance in 2015, RTI paid Hutchison a bonus in March 2016 of $208,622, and awarded him over 275,000 restricted shares and options.  If RTI had not appeared to achieve its revenue targets in 2015, Hutchison would have received a smaller bonus.

105.    Hutchison sold RTI stock during the Relevant Period.  In addition, from June 2017 through July 2018, Hutchison sold over $6 million worth of RTI stock, and realized profits from these stock sales.  RTI's stock price was inflated as a result of Hutchison's misconduct at the time he sold this stock.

106.    As a result of his stock sales, Hutchison obtained money or property by means of his materially false and misleading public statements.

### E.    Hutchison Did Not Meet His Obligation to Reimburse the Company for Incentive-Based Compensation and Profits from Stock Sales.

107.    Hutchison received bonuses, incentive-based compensation, and equity-based compensation from RTI during the twelve-month periods following the first public issuance or filing of the financial documents embodying RTI's financial reporting requirements for the periods covered by the financial documents restated by RTI.  Hutchison also realized profits from sales of RTI's securities during the twelve-month periods following the first public issuance or filing of the financial documents embodying RTI's financial reporting requirements for the periods covered by the financial documents restated by RTI.  As RTI's former CEO, Hutchison was therefore required by Section 304 of the Sarbanes-Oxley Act to reimburse Surgalign (as RTI's successor) for these amounts.

108.    Hutchison has not reimbursed Surgalign or RTI as required by Section 304 of the Sarbanes-Oxley Act.

### TOLLING AGREEMENTS

109.    Hutchison and the SEC entered into tolling agreements suspending the running of any applicable statutes of limitations from December 12, 2019, through June 9, 2021; from June 10, 2021, through September 10, 2021; from September 11, 2021, through December 31, 2021; and from January 1, 2022, through March 31, 2022.

## FIRST CLAIM FOR RELIEF
### (Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder)

110.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

111.    By engaging in the conduct described above, Hutchison, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

112.    Among other things, Hutchison directed the use of pull-forwards by RTI; permitted RTI to recognize revenue in violation of GAAP; and made false and misleading statements and/or omitted to state material facts necessary, in light of the circumstances under which they were made, to make the statements not misleading in his disclosures to investors, including by concealing RTI's reliance on pull-forwards and the risks and uncertainties associated with pull-forwards.

113.    While engaged in the conduct described above, Hutchison acted knowingly or recklessly.

114.    By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### (Violations of Securities Act Section 17(a))

115.     Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

116.     By engaging in the conduct described above, Hutchison, in the offer or sale of a security, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

117.     Among other things, Hutchison directed the use of pull-forwards by RTI; permitted RTI to recognize revenue in violation of GAAP; and made false and misleading statements and/or omitted to state material facts necessary, in light of the circumstances under which they were made, to make the statements not misleading, including by concealing RTI's reliance on pull-forwards and the risks and uncertainties associated with pull-forwards.

118.     While engaging in the conduct described above, Hutchison acted knowingly, recklessly, or negligently.

119.     By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### (Violations of Exchange Act Rule 13b2-1)

120.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

121.    By engaging in the conduct described above, Hutchison directly or indirectly falsified, or caused the falsification of, RTI's books, records, and accounts required by Section 13(b)(2)(a) of the Exchange Act [15 U.S.C. § 78m(b)(2)(a)], including by permitting RTI to recognize revenue in violation of GAAP.

122.    By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## FOURTH CLAIM FOR RELIEF
### (Violations of Exchange Act Rule 13b2-2)

123.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

124.    By engaging in the conduct described above, Hutchison made or caused to be made a materially false or misleading statement to an accountant in connection with a required audit of the issuer's financial statements or the preparation of a report required to be filed with the Commission, including by concealing from RTI's auditor that RTI had recognized revenue in violation of GAAP.

125.    By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM FOR RELIEF
### (Violations of Exchange Act Section 13(b)(5))

126.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

127.    By engaging in the conduct described above, Hutchison circumvented or failed to implement a system of internal accounting controls or falsified a book, record, or account of RTI, including by permitting RTI to recognize revenue in violation of GAAP.

128.    While engaging in the conduct described above, Hutchison acted knowingly.

129.    By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## SIXTH CLAIM FOR RELIEF
### (Violations of Exchange Act Rule 13a-14)

130.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

131.    By engaging in the conduct described above, Hutchison falsely certified that there were no untrue statements of material fact or omissions of material fact in RTI's periodic reports filed with the Commission, and that those reports fairly presented, in all material respects, RTI's financial condition and results of operations, when he knew that RTI had failed to disclose its reliance on pull-forwards to achieve its revenue guidance.

132.    By engaging in the conduct described above, Hutchison violated, and unless restrained and enjoined will again violate, Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SEVENTH CLAIM FOR RELIEF
### (Violations of Sarbanes-Oxley Act Section 304)

133.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

134.    Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243] requires the CEO of an issuer to reimburse that issuer, if it is required to prepare an accounting restatement due to the material noncompliance of the issuer with any financial reporting requirement under the

38

securities laws as a result of misconduct, for (a) any bonus or other incentive-based or equity-based compensation received by the CEO from the issuer during the 12-month period following each false filing, and (b) any profits realized from the CEO's sale of securities of the issuer during each such 12-month period.

135.    Hutchison has not reimbursed Surgalign for any portion of the bonuses, incentive-based compensation, equity-based compensation, or profits from his sales of RTI securities that he received during the 12-month periods following each filing of the financial statements restated by RTI.

136.    By reason of the foregoing, Hutchison violated Sarbanes-Oxley Act Section 304.

### EIGHTH CLAIM FOR RELIEF
**(Aiding and Abetting RTI's Violations of Securities Act
Sections 17(a)(2) and 17(a)(3))**

137.    Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

138.    RTI violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q] by reason of Hutchison's conduct described above, and by making false statements and misleading omissions of material fact.

139.    Hutchison knowingly or recklessly provided substantial assistance that aided and abetted RTI's violations, including by directing RTI's use of pull-forwards and concealing RTI's GAAP violations, reliance on pull-forwards, and the risks and uncertainties associated with pull-forwards.

140.    Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Hutchison is liable for those violations.

## NINTH CLAIM FOR RELIEF
### (Aiding and Abetting RTI's Violations of Exchange Act
### Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13)

141.     Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

142.     RTI violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] by reason of Hutchison's conduct described above and by making false statements and misleading omissions of material fact in its filings with the Commission.

143.     Hutchison knowingly or recklessly provided substantial assistance that aided and abetted RTI's violations, including by directing RTI's use of pull-forwards and concealing RTI's GAAP violations, reliance on pull-forwards, and the risks and uncertainties associated with pull-forwards.

144.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Hutchison is liable for those violations.

## TENTH CLAIM FOR RELIEF
### (Aiding and Abetting RTI's Violations of Exchange Act
### Sections 13(b)(2)(A) and 13(b)(2)(B))

145.     Paragraphs 1 through 109 are realleged and incorporated by reference as if fully set forth herein.

146.     RTI violated Exchange Act Sections 13(b)(2)(a) [15 U.S.C. § 78m(b)(2)(a)] and 13(b)(2)(b) [15 U.S.C. § 78m(b)(2)(b)] by reason of Hutchison's conduct described above, by failing to make and keep accurate books, records, and accounts, and by failing to devise and maintain a system of internal accounting controls.

147.    Hutchison knowingly or recklessly provided substantial assistance that aided and abetted RTI's violations, including by permitting RTI to recognize revenue in violation of GAAP.

148.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Hutchison is liable for those violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

A.    Issue findings of fact and conclusions of law that Hutchison committed the alleged violations;

B.    Permanently restrain and enjoin Hutchison from violating the federal securities laws alleged in the Complaint;

C.    Order Hutchison to pay civil monetary penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

D.    Order Hutchison to disgorge, with prejudgment interest, all funds received from his illegal conduct, together with prejudgment interest thereon, under Exchange Act Sections 21(d)(5) [15 U.S.C. § 78u(d)(5)] and 21(d)(7) [15 U.S.C. § 78u(d)(7)];

E.    Order Hutchison to reimburse Surgalign as required by Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243];

F.    Order, pursuant to Sections 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Hutchison is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

G.      Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered, or to entertain any suitable application or

motion for additional relief within the jurisdiction of this Court; and

H.      Grant such other and further equitable relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands

trial by jury.

Respectfully submitted,

/s/ *John B. Timmer*
John B. Timmer (DC Bar No. 997309)
        Tel: (202) 551-7687
        Email: timmerj@sec.gov
Nishchay Maskay (DC Bar No. 998983)
        Tel: (202) 551-8513
        Email: maskayn@sec.gov
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Dated:  August 3, 2022