**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN K. HUTCHISON, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Case No. 22-2296 (RJL) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION**

August 5th, 2026 [Dkt. #30, 32]

The U.S. Securities and Exchange Commission ("SEC") filed this civil enforcement action against Brian Hutchison for making misrepresentations to investors while he was the Chief Executive Officer of RTI Surgical Holdings. The SEC's core allegation is that Hutchison intentionally or recklessly failed to disclose the company's practice of shipping customer orders early to recognize revenue in earlier quarters, thereby artificially inflating the company's quarterly revenues. The undisputed facts establish that the company did ship customer orders early to inflate revenues, Hutchison knew about the practice and the risks it caused for the company's business, and he nonetheless failed to disclose this information to RTI's investors. For these reasons and the reasons that follow, I will **GRANT** in part and **DENY** in part the SEC's motion for summary judgment and will **DENY** Hutchison's cross-motion for summary judgment in full.

1

## BACKGROUND

### I.    Facts

The following facts are undisputed, unless otherwise indicated.[1]  The SEC claims

that Brian Hutchison violated multiple securities laws during all four quarters of 2015 and

the first two quarters of 2016 ("Relevant Period").

---

[1] The parties each filed three statements or counter-statements of undisputed material facts. *See* Pl. SEC's Statement of Material Facts as to Which There Is No Genuine Issue [Dkt. #30-2]; Def. Hutchison's Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. [Dkt. #32-85]; Pl. SEC's Counter-Statement of Genuine Issues of Material Facts in Resp. to Def.'s Mot. for Summ. J. [Dkt. #35-1]; Def.'s Statement of Undisputed Material Facts in Opp'n to Pl.'s Mot. for Summ. J. and in Resp. to Pl.'s Statement of Material Facts to Which There Is No Genuine Issue [Dkt. #34-1]; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts in Opp'n to Pl.'s Mot. for Summ. J. [Dkt. #37-2]; Def.'s Statement of Undisputed Material Facts in Further Supp. of Mot. for Summ. J. and in Reply to Pl.'s Counterstatement of Genuine Issues of Material Facts [Dkt. #36-1].  Defendant's Statement of Undisputed Material Facts in Opposition to Plaintiff's Motion for Summary Judgment [Dkt. #34-1] contains two parts.  Part I is defendant Hutchison's Supplemental Statement of Undisputed Material Facts and Part II contains Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue [Dkt. #30-2] with Hutchison's responses.  For ease of reference, Part II is hereinafter referred to as "PSUMF."  Defendant's Statement of Undisputed Material Facts in Further Support of Summary Judgment and in Reply to Plaintiff's Counterstatement of Genuine Issues of Material Facts [Dkt. #36-1] contains Hutchison's Supplemental Statement of Undisputed Material Facts in Part I and then Hutchison's first statement of undisputed material facts with the SEC's response and Hutchison's replies in Part II.  Part II of Defendant's Statement of Undisputed Material Facts [Dkt. #36-1] is hereinafter referred to as "DSUMF."  The SEC responded to Hutchison's first Supplemental Statement of Undisputed Material Facts [Dkt. #34-1] in its third statement [Dkt. #37-2], which is hereinafter referred to as "DSSUMF."

Local Civil Rule 7(h)(1) requires that the parties provide a "statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  The rule further states that an "opposition to such a motion shall be accompanied by a separate *concise* statement of genuine issues."  *Id.* (emphasis added).  It is well-established that "[a]rguments and invocations of legal authority are, of course, not facts, which alone should appear in [the parties'] Statement[s]."  *Wilkins v. D.C.*, 2019 WL 3767164, at *3 (D.D.C. Aug. 9, 2019).  Defendant Hutchison's statements and counterstatements of undisputed material facts contain excessive and improper legal argumentation. *See, e.g.,* PSUMF ¶¶ 145 (purporting to "dispute" a fact despite "not disput[ing] the assertion" because it is "immaterial" for a long list of reasons), 164 (similar), 205 ("Mr. Hutchison does not dispute the assertion.  But it is immaterial because RTI was not, in fact, violating the contract.").  Failure to adhere to the rules governing motions for summary judgment unnecessarily complicates the Court's task in deciding such motions.

2

## A.    *RTI Surgical Holdings*

During the Relevant Period, RTI Surgical Holdings ("RTI") was a publicly-traded company that manufactured surgical implants from synthetic materials and donated human tissues. PSUMF ¶ 1. RTI's Commercial division, which sold RTI's products to large distributors for resale, generated a significant amount of the company's revenue. *Id.* ¶ 2. RTI's Commercial division sales made up 46% of the company's revenue in 2015 and 37% of the company's revenue during the first half of 2016. *Id.* ¶¶ 5–6.

Defendant Brian Hutchison ("Hutchison") was RTI's Chief Executive Officer ("CEO") and a member of its Board of Directors from 2001 to 2016. *Id.* ¶ 29. Before becoming RTI's CEO, Hutchison spent twenty years in corporate management and finance, including as an internal auditor and accountant. *Id.* ¶¶ 30–31. As CEO, Hutchison reviewed and signed RTI's Form 10-Q and 10-K financial statements, attended RTI's Audit Committee calls, and approved scripts for earnings calls. *Id.* ¶¶ 38–39, 42. He participated in all of RTI's earnings calls in 2015 and 2016. *Id.* ¶ 35. Hutchison also "signed quarterly management representation letters to RTI's external auditors affirming that RTI's financial statements had been prepared and presented in accordance with GAAP, that he was not aware of any fraud, and that he had disclosed all deficiencies in RTI's internal control." *Id.* ¶ 44. Hutchison, along with Rob Jordheim, RTI's Chief Financial Officer ("CFO"), was responsible for preparing RTI's public revenue guidance. *Id.* ¶ 43.

RTI provided quarterly and annual revenue guidance to investors. *Id.* ¶ 9. Deloitte audited RTI's financial statements. *See id.* ¶¶ 146, 156. Deloitte's engagement partner

3

later testified that he would not have signed the audit opinions for RTI if he had known what he later learned. *Id.* ¶ 22.

## B.    *"Pulling Forward" Revenue*

This case is about RTI's practice of "pulling forward" revenue from future quarters to meet revenue goals for the current quarter. Like many publicly-traded companies, RTI stated publicly what it expected its quarterly and annual revenues would be. PSUMF ¶ 9. Financial analysts paid attention to RTI's revenue reports and to whether RTI was able to achieve its public revenue guidance. *Id.* ¶ 11. As a general matter, it was very important for RTI to meet its quarterly and annual revenue goals. *Id.* ¶ 50.

In RTI's Commercial division, RTI's major customers would typically place orders three months in advance of their requested delivery dates. *Id.* ¶ 4. This practice gave RTI significant visibility into its future orders and revenues. *Id.* RTI typically "recognized revenue"—meaning, counted revenue towards RTI's earnings—on the day that it shipped products. *Id.* ¶ 66. So an order shipped on December 31, 2015 would count towards Q4 2015 revenue even if the shipment arrived in 2016.

"Pulling forward" revenue occurred when RTI shipped an order in an earlier quarter than originally planned in order to meet RTI's revenue guidance. *Id.* ¶ 68. RTI regularly used "pull-forwards" to meet its revenue goals. *Id.* ¶ 70. Sometimes RTI reached out to the customers and obtained approval for the early shipments. *Id.* ¶ 104. Sometimes RTI sent early shipments without customer authorization and counted revenue for those shipments anyway. *See, e.g., id.* ¶ 339. Hutchison knew that under Generally Accepted

4

Accounting Principles, or "GAAP," "RTI should not recognize revenue from a shipment if a customer had not agreed to it or approved it." *Id.* ¶ 135.

### C.   *Relevant Transactions and Statements*

The SEC's claims concern all four quarters of 2015 and the first two quarters of 2016. RTI met or exceeded its revenue guidance for five of those six quarters, as shown below.

| Table 1: RTI's Quarterly Revenue Guidance and Reported Revenues During the Relevant Period | | | |
|---|---|---|---|
| **Quarter** | **Revenue Guidance** | **Reported Revenue** | **Outcome** |
| Q1 2015 | **$66–67 million.** PSUMF ¶ 221 | **$68 million.** PSUMF ¶ 222 | Exceeded revenue guidance |
| Q2 2015 | **$70–71 million.** PSUMF ¶ 222 | **$71.6 million.** PSUMF ¶ 248 | Exceeded revenue guidance |
| Q3 2015 | **$69–70 million.** PSUMF ¶ 248 | **$66.5 million.** PSUMF ¶ 281 | Failed to meet revenue guidance |
| Q4 2015 | **$68–69 million.** PSUMF ¶ 321 | **$76.1 million.** PSUMF ¶ 321 | Exceeded revenue guidance |
| 2015 | **$274–275 million.** PSUMF ¶ 316 | **$282.3 million.** PSUMF ¶ 315 | Exceeded revenue guidance |
| Q1 2016 | **$65–66 million.** PSUMF ¶ 381 | **$67.4 million.** PSUMF ¶ 381 | Exceeded revenue guidance |
| Q2 2016 | **$66–67 million.** PSUMF ¶ 398 | **$67.6 million.** PSUMF ¶ 398 | Exceeded revenue guidance |

**Q1 2015.** In February 2015, RTI's CFO informed Hutchison that RTI's quarterly revenue for Q1 2015 was likely to be "below guidance." PSUMF ¶ 213. In the same email, the CFO informed Hutchison that a high percentage of revenue was coming in the last month of each quarter and that this was "not a good trend." *Id.* ¶¶ 85, 214; SEC Ex. 16 [Dkt. #30-4]. The next day, the head of RTI's Commercial division informed Hutchison that "[w]e knew Q1 was going to be an issue with the Q1-15 shipments in December [2014]

totaling $7.4M for the commercial group." SEC Ex. 17 [Dkt. #30-4]; PSUMF ¶ 215. Hutchison forwarded the email to the CFO and said "how much [is] he suggesting was shipped in December[?]" and "Seems really high." SEC Ex. 17 [Dkt. #30-4].

Despite these issues, Hutchison wrote a letter to the board in February 2015 saying that declines in the Commercial division's revenues were due to "short term inventory management on the part of the partners." SEC Ex. 119 [Dkt. #30-6]; PSUMF ¶ 218. In March 2015, the CFO told Hutchison that the Commercial division was "going to try and ship more to make up some of the shortfall" in RTI's expected revenue, because "it would be nice to at least hit our guidance." PSUMF ¶ 220. An RTI employee conducted an analysis that RTI "pulled forward" $5.8 million of revenue into Q1 2015 from Q2. *Id.* ¶ 225.

On April 23, 2015, RTI issued a Form 8-K reporting quarterly revenues of $68 million for Q1 2015, exceeding its revenue guidance of $66–67 million. *Id.* ¶¶ 221–22. RTI issued a press release in which Hutchison stated, "We saw solid growth in the first quarter, exceeding our expectations and keeping us on track for the year." *Id.* ¶ 222. In the same release, Hutchison further stated, "Based on results from the first quarter, I am confident in our ability to meet our goals for the year." *Id.*

In an earnings call that same day, Hutchison responded to a question about what was driving growth for orthofixation, a particular product category, by saying that "Q1 is really a continuation off of Q4. If you remember in Q4, we had really strong growth, and that's continuing into Q1. We do expect that to moderate a little bit over the next three quarters as the comps get a little bit tougher, but it's just—the orders from our commercial partners

6

just keep coming in." DSSUMF ¶ 5; *see also* PSUMF ¶ 223. RTI's Form 10-Q for Q1 2015 did not disclose any risks from pulling forward orders. PSUMF ¶¶ 228–30.

**Q2 2015.** In early June 2015 (the last month of Q2), the CFO emailed Hutchison to say that "[w]e are rolling up to $69 million against guidance of $70 to $71 million." SEC Ex. 23 [Dkt. #30-4]. The CFO said this was "[o]bviously very concerning" and "[i]n addition, I don't think we have much latitude for commercial to save the day." *Id.*; *see also* PSUMF ¶ 233. The CFO then projected that RTI would be able to meet its quarterly revenue number through customers agreeing to accept orders earlier than originally requested. PSUMF ¶ 234. Hutchison was told in a weekly meeting that a $1.6 million order would be a "pull-in." *Id.* ¶ 235.

In June 2015, RTI decided to ship early all of the July 2015 orders from Davol, one of its major Commercial division customers. *Id.* ¶ 239. On June 30, 2015—the last day of Q2—RTI shipped a $535,245 order to Davol that had a "Delivery Date" of July 15, 2015. *Id.* ¶¶ 240–41. In internal correspondence, Davol employees characterized the $535,245 shipment as an "early shipment" that "was not requested by Davol Supply Chain." SEC Ex. 141 [Dkt. #30-8]. The employees stated that the early shipment "[c]learly . . . benefits RTI's quarter end revenue" and "unfavorably hit[s] our inventory," and Davol resolved to "pursu[e] a discount for this early shipment." *Id.*; *see also* PSUMF ¶ 242. An RTI employee agreed that the Davol shipment was "unauthorized," PSUMF ¶¶ 246–47, but RTI nonetheless recognized revenue for that shipment in Q2, *see id.* ¶¶ 251–52.

7

On July 30, 2015, RTI issued a Form 8-K reporting quarterly revenues of $71.6 million for Q2 2015, exceeding its revenue guidance of $70–71 million. *Id.* ¶¶ 248–49. RTI's Form 10-Q did not disclose the use of pull-forwards. *Id.* ¶¶ 254–55.

In the Q2 earnings call, Hutchison stated that "[o]verall, our business model continues to work very well. We exceeded our guidance on the top and bottom line for the quarter." DSSUMF ¶ 6. He said that the "[r]evenue mix shifted somewhat to commercial in the quarter, which we anticipate will reverse during the second half of [the] year." *Id.* Regarding RTI's spine business, Hutchison stated that "worldwide direct spine growth will accelerate in the second half of this year, but will be offset by declines in the commercial business due to timing of orders." *Id.*

**Q3 2015.** In August 2015, RTI's CFO told Hutchison that RTI's expected Q3 revenue would be "$69 million exactly, which is the very low end of our guidance for Q3." PSUMF ¶ 257. Hutchison characterized this information as "really unacceptable." *Id.* In a September 7 email to RTI executives, "Hutchison questioned whether the Commercial division 'can bail us out [this] quarter' and directed [his team] 'to do better.'" *Id.* ¶ 258. On September 29, Hutchison was informed that a Commercial division customer had refused to agree to an early shipment and called this development "[n]ot good." *Id.* ¶ 262.

In September 2015, the head of RTI's Commercial division told Hutchison that they were planning to pull forward $6.8 million in products from Q4 into Q3. *Id.* ¶ 263. That same month, RTI shipped a nearly $1.8 million order to Zimmer Biomet without preapproval from Zimmer. *See id.* ¶¶ 266–68. The Zimmer Biomet representative responded by saying, "I need to understand why you approved early shipment without my

8

approval" and "[t]his has caused a lot of issues since it made my inventory levels go sky high." SEC Ex. 9 [Dkt. #30-4]. The Zimmer Biomet employee went on to say that "I have asked [RTI employee] to not ship ANYTHING early without prior approvals." *Id.*

On September 30, 2015, without Medtronic's preapproval, RTI shipped Medtronic $259,335 of product that was not due until November. PSUMF ¶ 279.

On October 29, 2015, RTI issued a Form 8-K reporting quarterly revenue of $66.5 million for Q3 2015, falling short of its revenue guidance of $69–70 million. *Id.* ¶¶ 281–82. RTI's Form 10-Q did not disclose the use of pull-forwards. *Id.* ¶¶ 288–89.

In the Q3 earnings call, Hutchison stated that RTI was "subject to the varying ordering patterns of our large commercial distributors" and that based on "orders currently in hand and projected orders," RTI expected "the commercial business to decline in Q4." DSUMF ¶ 58. In response to analysts' follow-up questions, Hutchison said that for the next quarter, "the biggest contributor is really . . . the drop in commercial orders for the fourth quarter." *Id.* ¶ 59. Hutchison noted that commercial orders "can be lumpy in the fourth quarter," adding that "[w]e're seeing a holdback" in those orders. *Id.*

**Q4 2015.** On December 8, 2015, Hutchison characterized the Commercial division as a "train wreck" and "so bad" in an internal email. PSUMF ¶ 291.

In November 2015, customer Zimmer Biomet agreed to convert a consignment arrangement to a one-time purchase in exchange for a 25% discount. PSUMF ¶ 295. Pursuant to this agreement, Zimmer Biomet purchased products related to RTI's GTR cabling system for $7.2 million (the "GTR transaction") in December 2015. *Id.* ¶¶ 295–96. As of June 2015, Hutchison had been aware of plans for the transaction and knew that

RTI employees had suggested that the one-time purchase would help RTI meets its 2015 revenue goals. *Id.* ¶ 292. In late December 2015, Hutchison and the CFO had a discussion about whether the GTR transaction should be disclosed, with Hutchison asking, "Do you know for sure that we do not have to disclose it?" *Id.* ¶ 297. A partner at Deloitte—RTI's external auditor—suggested to RTI that it disclose more details about this transaction, but RTI did not make any separate disclosure. *Id.* ¶¶ 299–300.

Also in December 2015, RTI's CFO told an employee that "we need to ship whatever it takes to get to [the $]12.9 million." SEC Ex. 204 [Dkt. #30-10]; *see* PSUMF ¶ 302. In late December, RTI sent Zimmer a shipment of goods with delivery dates in Q1 2016. PSUMF ¶¶ 305–06. In early January, Zimmer emailed RTI to say that this shipment included "quite a lot of product in the last few days of the year . . . that was not scheduled for delivery until March of 2016." *Id.* ¶ 309. The Zimmer buyer said that he had not authorized the early shipment and any such authorization would have been by email. *Id.* ¶ 311. The parties dispute whether Zimmer in fact authorized the early shipment over the phone. *See id.* ¶ 306. On January 13, 2016, Hutchison received an email stating that "RTI's early shipments to Zimmer [] resulted in Zimmer changing policy to require advance notice of all shipments." *Id.* ¶ 312. The email went on to say: "Effective today [Zimmer] requires a 48 hour notice for all shipment. They will not accept early shipments without prior approval . . . . This is in response to the December shipping schedules." SEC Ex. 35 [Dkt. #30-4]; *see also* PSUMF ¶ 312.

On February 16, 2016, RTI issued a Form 8-K reporting quarterly revenue of $76.1 million for Q4 2015, exceeding its revenue guidance of $68–69 million. *Id.* ¶¶ 315–16.

10

RTI announced revenues of $282.3 million for 2015 against its revenue guidance of $274–275 million. *Id.* In RTI's preliminary earnings release for Q4 2015, which was filed as an attachment to a Form 8-K, Hutchison said, "We are pleased that revenues of $76.1 million in the fourth quarter exceeded our guidance of $68 million to $69 million." *Id.* ¶ 321. Hutchison also said, "In the fourth quarter, we benefitted from stronger than expected orders from certain commercial distributors. As we have mentioned in prior quarters, the commercial business is less predictable on a quarterly basis due to the timing of distributor orders." *Id.*

On February 16, 2016, in the Q4 earnings call with investors, Hutchison said that RTI's Q4 2015 performance was due to "higher-than-expected" orders and "industry consolidation." *Id.* ¶ 322. Hutchison predicted "low double-digit declines" in RTI's Commercial business, and explained that the "primary reason for this decline is that we do not expect the benefits that we experience[d] in 2015 from the consolidation of some of our commercial customers to continue into 2016." DSUMF ¶ 65. Hutchison signed RTI's Form 10-K for 2015, which was filed with the SEC on March 7, 2016. PSUMF ¶ 323. The Form 10-K did not disclose the use of pull-forwards or any of the attendant risks to RTI's future business. *Id.* ¶ 324.

**Q1 2016.** In January 2016, the head of RTI's Commercial division told Hutchison that one of its customers, Medtronic, was becoming less willing to accept orders due in future quarters. PSUMF ¶ 327. On March 22, the CFO informed Hutchison that Medtronic had rejected RTI's offer of a 9% discount to accept a $1 million early shipment. *Id.* ¶ 329. The CFO said that as a result, "we have no buffer" if other divisions "miss." *Id.* That same

11

day, Hutchison emailed RTI employees to say, "I am told that [Commercial] have no more upside . . . There is no cushion no room for error. We need to hit the guidance." *Id.* ¶ 331.

On March 17, the head of RTI's Commercial division told the CFO regarding Synthes's orders that "we are just going to ship and deal with any issues later." *Id.* ¶ 335. On March 29, RTI shipped products to Synthes that had been scheduled for delivery in April and May 2016. *Id.* ¶ 340. Synthes had specified that "Delivery Performance" "shall be measured by a five (5) Business Days early, zero (0) Business Days late expectation." *Id.* ¶ 338; *see also* SEC Ex. 223 [Dkt. #30-10]. Synthes never provided advance permission to send the March 2016 shipment outside that window. PSUMF ¶ 339. On April 1, Synthes' buyer called RTI and expressed frustration about the early shipment, which was large and unexpected. *Id.* ¶¶ 342–43. Synthes told RTI that it did not have space to house the excess inventory but decided not to return the product since Synthes would need it at some point in the future and because the shipment included sterile products. *Id.* ¶¶ 347– 48. On April 4, Hutchison received an email stating, "Synthes called last Friday pretty upset about the amount of product we shipped at quarter end. They are contemplating returning at least a subset of the early items." *Id.* ¶ 360. A separate email to Hutchison stated that the value of the shipment was $1.6 million and that Synthes "indicated to [RTI] that they want to ship back the entire shipment from last week ($1.6M)." *Id.* ¶ 361.

In response, RTI offered Synthes a discount and extended payment terms. *Id.* ¶¶ 351–52. By April 6, RTI, having received no response to its discount offer, contacted Synthes, saying, "we really need to close the books on the quarter and this is the last piece of information needed by Accounting." *Id.* ¶ 353. On April 7, RTI closed its books for Q1,

but as of April 8 Synthes had still not responded to RTI's discount offer. *Id.* ¶¶ 354–55. Hutchison was aware that RTI had shipped product to Synthes earlier than the delivery date without its permission. *Id.* ¶ 358. "Hutchison acknowledged that the orders to Synthes 'were shipped before they were due. So we knew there was potential we were going to have to issue credit and take them back.'" *Id.* ¶ 359. Hutchison admitted that the back-and-forth showed that RTI's relationship with Synthes was "broken" in a "pretty severe" way. *Id.* ¶ 365.

Hutchison did not consult with RTI's controller or RTI's auditors about this transaction. *Id.* ¶¶ 371, 373, 375. RTI's controller later said—with reference to the Synthes order—that "[i]f the shipment was not approved, I don't believe the revenue should have been recorded." SEC Ex. 217 [Dkt. #30-10]; *see also* PSUMF ¶ 374. The early shipments in Q1 resulted in a drop in shipments in Q2 because RTI "didn't have the orders in 3Q16 to offset." SEC Ex. 56 [Dkt. #30-5]; PSUMF ¶ 380.

On April 28, 2016, RTI issued a Form 8-K reporting quarterly revenue of $67.4 million for Q1 2016, exceeding its revenue guidance of $65-66 million. PSUMF ¶ 381. That same day, Hutchison stated in an earnings call that RTI's Q1 2016 revenues "exceed[ed] Company guidance" and that RTI's commercial business had "achieved [a] compound average annual growth rate of 7%" since 2005. *Id.* ¶ 382. Hutchison said that "[f]or the second quarter 2016," RTI expected "declines of approximately 30% in our commercial business" because "we do not expect the benefits that we experienced in 2015 from the consolidation of some of our commercial customers to continue into 2016." DSUMF ¶ 75.

13

**Q2 2016.** On June 21, 2016, RTI employees confirmed that "we will be shipping Zimmer July orders early without notification . . . for their receipt on 6/30." PSUMF ¶ 391. RTI then shipped a nearly $1.4 million order to Zimmer early without preapproval from Zimmer. *Id.* ¶¶ 392–93.

On July 8, RTI's Vice President of Commercial told Hutchison that RTI's internal revenue forecast should be lowered by $4 million because it was higher than forecasts provided by RTI's distributor customers. *Id.* ¶ 394. On July 15, Hutchison was informed that lower than expected revenues for Q2 were due in part to "prior order book management." *Id.* ¶ 396. Some RTI employees understood "order book management" to be another term for "early shipments." *Id.* ¶ 127.

On July 27, RTI issued a Form 8-K reporting quarterly revenue of $67.6 million for Q2 2016, exceeding its revenue guidance of $66–67 million. *Id.* ¶ 398. In the same release, RTI reduced its overall revenue guidance for 2016 to $274–280 million from prior guidance of $282–290 million "[b]ased on the outlook for the commercial business for the remainder of the year." *Id.* Hutchison stated that there were "declines in [its] commercial business that were greater than [] anticipated because of lower orders associated with consolidation among some of [its] commercial distributors." *Id.* In an earnings call, Hutchison described the "primary reason" for the reduction in revenue guidance as changes in forecasts from RTI's commercial customers. *Id.* ¶ 399.

**D.    *Hutchison's Resignation and Subsequent Investigation and Restatement***

In late 2016, the RTI Board—dissatisfied with Hutchison's performance—asked Hutchison to step down, and he left RTI on December 16, 2016. PSUMF ¶¶ 63, 65.

14

In 2020, following an internal investigation, RTI filed an amended Form 10-K (the "2020 Restatement" or "Restatement"). *Id.* ¶ 15. In it, RTI restated its quarterly and year-end statements for 2016, 2017, and 2018, as well as certain year-end financials for 2014 and 2015. *Id.* In the Restatement, RTI acknowledged that "[i]t prematurely recognized revenue for shipments that were sent 'before requested delivery dates and agreed-upon delivery windows' and 'delivered early without obtaining the customers' affirmative approval.'" *Id.* ¶ 16. The Restatement said that certain "unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter." *Id.* The Restatement said that there were "certain material weaknesses" in RTI's "internal control over financial reporting" as of December 31, 2018. *Id.*

Members of RTI's subsequent management and Audit Committee agreed that the Restatement was "needed." SEC Ex. 201 [Dkt. #30-10]; SEC Ex. 202 [Dkt. #30-10]; SEC Ex. 207 [Dkt. #30-10]; SEC Ex. 224 [Dkt. #30-10]; PSUMF ¶ 17. The Restatement "did not restate revenue from shipments that were sent early at the customer's request." PSUMF ¶ 21.

In July 2020, RTI sold parts of its operations to a third party and was renamed as Surgalign Holdings, Inc. *Id.* ¶ 26. In 2022, Surgalign Holdings, Inc. and RTI's CFO Robert Jordheim settled charges with the SEC relating to the events during 2015 and 2016. RTI paid a $2 million penalty to the SEC, and Jordheim agreed to pay a $75,000 penalty and reimburse the company over $200,000. *Id.* ¶ 27. In 2023, Surgalign commenced bankruptcy proceedings. *Id.* ¶ 28.

## II.    Procedural History

Following an investigation, the SEC filed this civil enforcement action against Hutchison, advancing ten claims for relief under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and rules thereunder, and the Sarbanes-Oxley Act. Compl. [Dkt. #1] ¶¶ 110–48. Hutchison filed a motion to transfer venue [Dkt. #13], which I denied. *See* Mem. Order [Dkt. #24]. Now, both parties have moved for summary judgment. *See* Pl.'s Mot. for Summ. J. [Dkt. #30]; Pl.'s Mem. in Supp. of Mot. ("SEC Br.") [Dkt. #30-1]; Def.'s Mot. for Summ. J. [Dkt. #32]; Def.'s Mem. in Supp. of Mot. ("Def.'s Br.") [Dkt. #32-1]; Def.'s Opp'n to Pl.'s Mot. ("Def.'s Opp'n") [Dkt. #34]; Pl.'s Opp'n to Def.'s Mot. ("SEC Opp'n") [Dkt. #35]; Def.'s Reply in Supp. of Mot. ("Def.'s Reply") [Dkt. #36]; Pl.'s Reply in Supp. of Mot. ("SEC Reply") [Dkt. #37]. The motions are ripe for consideration.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court "must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." *Dist. Intown Props. Ltd. P'ship. v. Dist. of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999). "When parties file cross-motions for summary judgment, each motion is considered separately, in the light most favorable to the non-moving party, and the court must determine, for each motion, whether the Rule 56

16

standard has been met." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 80 (D.D.C. 2025).

## ANALYSIS

### I.    Securities Fraud Claims (Counts I and II)

The SEC claims that Hutchison violated Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" SEC rules and regulations.   15 U.S.C. § 78j(b).   In turn, Rule 10b-5 makes it unlawful for issuers of registered securities to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

To prevail on its Section 10(b) and Rule 10b-5 claim, the SEC must show that Hutchison "(1) made a material misrepresentation or a material omission as to which he had a duty to speak . . . ; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Familant*, 910 F. Supp. 2d 83, 92 (D.D.C. 2012) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)). "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Id.* at 91 (quoting *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

"Section 17(a) of the Securities Act also prohibits securities fraud." *SEC v. Kokorich*, 663 F. Supp. 3d 63, 75 (D.D.C. 2023).   A violation of Section 17(a)(1) has

17

"essentially" the same elements as Rule 10b-5 except that it requires that the misrepresentation or omission happen "in the offer or sale, rather than in connection with the purchase or sale, of a security." *SEC v. Levine*, 671 F. Supp. 2d 14, 26–27 (D.D.C. 2009). Sections 17(a)(2) and (a)(3) have the same elements except "they do not require a showing of scienter." *Kokorich*, 663 F. Supp. 3d at 76 (internal quotation marks omitted). "Instead, proof of negligence is sufficient to establish a violation of these provisions." *Id.* (internal quotation marks omitted).

### A.    *Misrepresentation or Omission*

The first contested element is whether Hutchison's statements were "false or misleading." *Kokorich*, 663 F. Supp. 3d at 76 (quoting *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 75–76 (D.D.C. 2019)). "A statement or omission is misleading if a reasonable investor, reading the statement fairly and in context, would be misled." *Id.* (quoting *Plymouth*, 370 F. Supp. 3d at 76). "In addition, the statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *Id.* (quoting *Plymouth*, 370 F. Supp. 3d at 76).

Regarding omissions, Rule 10b–5(b) prohibits "half-truths, not pure omissions." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). "Rule 10b–5(b) requires disclosure of information necessary to ensure that statements already made are clear and complete." *Id.* "The 'disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.' Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead

18

investors." *Karth v. Keryx Biopharmaceuticals, Inc.*, 2018 WL 3518497, at *4 (D. Mass. July 19, 2018) (quoting *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994)).

The undisputed facts show that Hutchison's statements were misleading in at least three ways.

*First*, Hutchison's statements were misleading because they failed to disclose that RTI relied on pulling forward shipments to meet its revenue guidance. *See* SEC Br. at 27. Hutchison does not dispute that RTI regularly used pull-forwards to meet revenue goals. PSUMF ¶ 70. During the Relevant Period, Hutchison stated that RTI exceeded its quarterly revenue guidance for five out of six quarters. *Id.* ¶¶ 221, 222, 248, 281, 321, 381, 398. Hutchison made a variety of statements to investors to explain RTI's revenue trends and its ability to meet RTI's revenue guidance. *See, e.g.*, DSSUMF ¶¶ 5–6. But Hutchison *never* disclosed RTI's reliance on pulling forward revenue from future quarters. *See* PSUMF ¶ 14. Hutchison's omissions were misleading because, while he "correctly identified" RTI's success in meeting its revenue goals, "he failed to provide necessary context for a reasonable investor to understand the limited nature of that success"—namely, that RTI relied on pulling forward shipments from future quarters to meet its revenue guidance. *Kokorich*, 663 F. Supp. 3d at 78.

As the SEC points out, Item 303 of Regulation S-K requires the disclosure, in the Management's Discussion & Analysis section of Forms 10-Q and 10-K, of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from

19

continuing operations." 17 C.F.R. § 229.303 (2011). As discussed below, RTI's reliance on pulled-forward shipments was material to investors, and as such Hutchison had a duty to disclose that RTI was pulling forward shipments to meet revenue goals.

*Second*, Hutchison's statements were misleading because they omitted the fact that RTI was recognizing revenue for early shipments that did not receive preapproval from customers. Hutchison does not dispute that for at least six early shipments, there was no customer preapproval, yet RTI recognized revenue for those shipments anyway. *See* PSUMF ¶¶ 239–41, 266–68, 279, 305–07, 361–74, 391–92. Under GAAP, RTI should not have recognized revenue from a shipment if a customer had not agreed to it or approved it, PSUMF ¶ 135, so the inclusion of the six shipments in RTI's revenue numbers before customers had accepted the orders was misleading.

*Third*, Hutchison's statements were misleading because they omitted the damage to customer relationships and risks to RTI's future business caused by sending early shipments. Pull-forwards created a "kind of never-ending cycle [of] pulling revenue from a later quarter." PSUMF ¶ 92. Early shipments did not result in additional orders. *Id.* ¶ 93. RTI at times offered customers discounts for accepting early shipments. *Id.* ¶¶ 104–05. Hutchison understood that offering large discounts to customers was problematic because they would become accustomed to receiving them. *Id.* ¶ 330. Specific Commercial division customers complained after receiving unauthorized early shipments, with one— Medtronic—even threatening legal action. *See, e.g.*, PSUMF ¶¶ 202, 365. Yet neither Hutchison nor RTI disclosed the use of pull-forwards or any of the associated risks to RTI's future revenues or customer relationships.

20

Hutchison's arguments in response and his affirmative arguments for summary judgment in his favor are not persuasive.

*First*, Hutchison argues that his statements were not misleading because he "commented negatively on the Commercial Division's performance and its future revenue outlook." Def.'s Reply at 1. For one, not all of Hutchison's statements about the Commercial division were "negative." Hutchison continued to forecast that RTI would "meet our goals for the year," PSUMF ¶ 222, and he emphasized RTI's positive results in exceeding its revenue guidance for five out of six quarters, *see id.* ¶¶ 221, 222, 248, 281, 321, 381, 398. For another, Hutchison's vague statements that there would be "declines" in the Commercial business due to "timing of orders," DSSUMF ¶ 6, or "lump[iness]" in orders, DSUMF ¶ 59, did not disclose RTI's decision to pull forward orders. It was misleading for Hutchison to explain why there were "declines" in the Commercial business without discussion of pulling forward orders. *See Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 307 (D.D.C. 2016) ("A statement regarding successful financial performance, even when accurate, is still misleading under the securities laws if the speaker attribut[es] the performance to the wrong source." (quoting *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010)).

*Second*, Hutchison argues that because it was *proper* to recognize revenue for early shipments when the customer agreed to the early shipment, RTI's failure to disclose its reliance on pull-forwards was not deceptive. *See* Def.'s Br. at 16–18. Hutchison's arguments miss the point because the SEC's claims are not that pull-forwards were inherently deceptive or improper. Rather, the SEC's claims are that RTI and Hutchison

21

misled investors by failing to disclose the extent to which RTI relied on pull-forwards to meet its revenue guidance. *See* SEC Opp'n at 9. So Hutchison's arguments about the propriety from an accounting perspective of recognizing revenue for early shipments when customers agreed upon the shipments are irrelevant.

*Third*, Hutchison cites several cases to argue that "shipping before an order's due date is not deceptive or otherwise improper." Def.'s Br. at 18. None are on point. In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856 (N.D. Ill. 2010), the "allegations regarding pulling sales forward, accelerating sales, or incentivizing sales did not withstand the motion to dismiss." *Id.* at 903. The only remaining claim concerned allegations that the company "shipp[ed] unordered products or products that the customers did not want." *Id.* Here, the SEC's claims are about pulling forward revenue, not shipped unordered product.

*In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) involved allegations that certain sales should have been recorded on a consignment basis instead of being recognized as revenue when the goods shipped. *See id.* at 566. The issue was whether "offering incentives to wholesalers to buy more product than they currently need in order to meet earnings estimates" was evidence of "conscious misbehavior or recklessness." *Id.* The court concluded that the practice of offering incentives to wholesalers, without more, was insufficient to prove scienter. *See id. Bristol-Myers* is distinguishable because this case is not solely based on accounting errors. For the same reason, *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622 (N.D. Ill. 2020) is not on point because it concerned allegations that revenue

numbers were fraudulent due to accounting issues with recognizing revenue. *See id.* at 640.

*In re Smith & Wesson Holding Corp. Securities Litigation*, 836 F. Supp. 2d 1 (D. Mass. 2011) concerned allegations that the defendants fraudulently misrepresented the "demand" for products. *Id.* at 3. Based on the record, the court held that "[p]ull-ins," "in which a seller offers incentives to potential buyers to make short-term purchases," were not sufficient to show that defendants' statements about overall *demand* for the products were false or misleading. *Id.* at 10; *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) (similar). Here, the SEC is not relying on the use of pull-forwards to argue that some other aspect of Hutchison's disclosures were false—rather, the point is that Hutchison's failure to disclose reliance on pull-forwards was itself misleading.

*Fourth*, Hutchison argues that the six early shipments sent without customer preapproval were not deceptive because, among other reasons, the contracts did not prohibit early delivery, and RTI achieved high ratings on customers' delivery scorecards. *See* Def.'s Opp'n at 7, 10–11, 17–20, 24, 28–29. Just because RTI's customers did not expressly prohibit early deliveries does not mean that RTI had permission to send deliveries anytime before the due date. For example, Hutchison asserts that "RTI's Distribution Agreement with Davol stated that RTI 'shall have the right to ship . . . in advance of the required delivery dates specified' by Davol." Def.'s Opp'n at 7 (quoting DSSUMF ¶ 12). The full text of the contract says that RTI "shall have the right to ship Licensed Products covered by any Transfer Order *on a weekly basis* in advance of the required delivery dates." DSSUMF ¶ 12 (emphasis added). In Q2 2015, RTI shipped the $535,245 order to Davol

23

on June 30, 2015, more than one week before the due date of July 15, 2015. *See* PSUMF ¶¶ 240–41. Hutchison's assertions regarding customer Medtronic's delivery scorecards of 97%, 100%, and 100% for "On Time Orders" in September, October, and November 2015, respectively, are beside the point because Hutchison does not dispute that RTI sent an early shipment to Medtronic without preapproval in September 2015 and that RTI's practice of early shipments caused problems in RTI's customer relationship with Medtronic, such as Medtronic's threat of legal action against RTI for early shipments. *See* PSUMF ¶¶ 202, 279.

*Fifth*, Hutchison argues that RTI's reliance on pull-forwards did not "jeopardize" RTI's future sales because the 2020 Restatement made a "negligible" adjustment to RTI's quarterly revenues and showed a "consistent" revenue trend. Def.'s Br. at 20–21. Hutchison's reliance on the 2020 Restatement is puzzling because the Restatement only accounted for *unauthorized* early customer shipments and did not account for the broader practice of pulling forward revenue based on future quarters. *See* DSUMF ¶ 140 (Restatement "only applied to the shipments whose revenue was recognized in violation of GAAP and did not apply to early shipments made with customer approval"). Hutchison does not ultimately dispute the fact that RTI executives believed that pulling forward revenue reduced revenue for future periods, creating a "never-ending cycle." *See* PSUMF ¶¶ 92, 94–96.[2]

---

[2] Hutchison nominally disputes these facts on grounds that "revenue could be generated other than by pull-forwards." *See* PSUMF ¶¶ 89, 96. This assertion is beside the point—of course, it was always *possible* that revenue could come from other sources to offset the declines in revenue from pulled-forward orders.

*Sixth*, Hutchison disputes the impact of pulling-forward shipments on RTI's customers. *See* Def.'s Br. at 23–24. Hutchison principally relies on a February 2020 "draft revenue recognition memo" that Ryan Bartolucci, RTI's controller, drafted and sent to a Deloitte partner. DSUMF ¶ 161. The 2020 revenue recognition memo states that "[o]ver the last 5 years, RTI Surgical has not experienced any significant negative feedback around early shipments." *Id.* Hutchison also argues that the lack of customer returns and high "on-time" delivery scores show that RTI's customers were not "alienated" by pulled-forward shipments. *See* Def.'s Br. at 23–25.

Hutchison's arguments are not persuasive because (1) the SEC disputes the finality and accuracy of the 2020 "draft revenue recognition memo" based on subsequent reports and statements by Bartolucci, *see* DSUMF ¶ 161; (2) Hutchison does not dispute the SEC's more detailed facts about specific customer complaints and Hutchison's acknowledgment of the strain on customer relationships caused by pull-forwards, *see, e.g.,* PSUMF ¶ 342; and (3) the SEC has explained that returns were not common for RTI's products due to the types of products (some of which used donated human tissues) and the nature of RTI's customers' business, *see* PSUMF ¶¶ 207–08.

In sum, the undisputed facts establish that Hutchison's statements were misleading because they failed to disclose RTI's reliance on pull-forwards and the corresponding impact to RTI's future revenues and customer relationships.

## B.    *Materiality*

"The Supreme Court has defined materiality under Section 10(b) and Rule 10b–5 as 'a substantial likelihood that a reasonable shareholder would consider it important in

25

deciding how to vote.'" *Rockies Fund, Inc. v. S.E.C.*, 428 F.3d 1088, 1096 (D.C. Cir. 2005) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "The Court further explained that if there is a substantial likelihood that a reasonable investor would have viewed the misleading or omitted fact as 'significantly alter[ing] the total mix of information,' it is material." *Id.* (quoting *Basic*, 485 U.S. at 232). "Only if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (internal quotation marks omitted).

The failure to disclose pulled-forward revenue and the corresponding risks to RTI's business was material. RTI's quarterly revenue and its ability to meet its revenue goals were indisputably material to investors. *See, e.g.*, PSUMF ¶¶ 282–83, 287 (RTI's stock price fell by 13.2% after RTI missed its revenue guidance for Q3 2015). It follows that RTI's need to pull forward revenue to meet its revenue goals would have been material to investors. For four quarters during the Relevant Period, RTI would not have met its revenue goals without pulled-forward shipments. *See* PSUMF ¶¶ 225–26, 252–53, 319–20, 386–87; *see also S.E.C. v. Rosenberger*, 2024 WL 308198, at *10 (S.D.N.Y. Jan. 26, 2024) (material that "Company would not have met consensus analyst expectations for Q4 2015 if it had not included the revenue from the [] sale"). For the quarter in which RTI failed to meet its revenue goal, the fact that RTI was unable to meet its goals despite pulling forward $8.4 million in shipments—over 10% of the quarter's revenue—would likely have been material to investors. PSUMF ¶¶ 281, 284, 286. As Hutchison himself

26

acknowledged, if RTI were in fact pulling forward $7.4 million in revenue in one quarter, $7.4 million was "really high." *Id.* ¶ 215.

The SEC points to additional evidence that corroborates the materiality of Hutchison's misstatements. A "company's decision to publicly restate the transaction and label it a material error, combined with [an] expert report demonstrating the material nature of the misstatement," can "establish[] materiality." *S.E.C. v. Jacoby*, 2021 WL 351176, at *14 (D. Md. Feb. 2, 2021); *see also SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 23–24 (D.D.C. 2017) ("Courts have held that the issuance of a restatement sufficiently pleads materiality because under GAAP, a restatement issues only when errors are material." (internal quotation marks omitted)). RTI's Restatement of revenue for 2015 and Q1 and Q2 of 2016, among other quarters, supports the materiality of the misstatements. *See* PSUMF ¶¶ 15–16. There is no dispute that the Restatement found that RTI recognized revenue for shipments sent "before requested delivery dates and agreed-upon delivery windows" and that certain "unapproved shipments were shipped by employees in order to generate additional revenue." *Id.* ¶ 16.

Matthew Hewitt, a Senior Research Analyst at Craig-Hallum Capital Group LLC, followed RTI's performance during the Relevant Period and stated that "revenue guidance was an important factor in helping me determine my valuation of RTI" and that RTI's ability to achieve its revenue guidance "affected my view of management's credibility." PSUMF ¶¶ 405–06. Hewitt did not know that RTI relied on pulling forward revenue during the Relevant Period to achieve its goals and stated that it "would have been important" to know that information. *Id.* ¶ 407.

27

The SEC also proffers the opinions of two experts that RTI violated GAAP by recognizing revenue for the Synthes shipment and that the error was material, and that the 13.2% decline in RTI's stock price after RTI missed its Q3 2015 guidance was "statistically significant." PSUMF ¶¶ 410–11, 412–14.[3]  One expert, Dr. Lehn, also concluded that the 10.4% drop in RTI's stock price was principally caused by RTI's announcement in Q2 2016 that it was lowering its revenue guidance for the rest of the year. *Id.* ¶ 413; *see also Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 816 F. Supp. 3d 423, 434 (S.D.N.Y. 2026) ("investor reactions to defendants' eventual disclosure of the declining sales [was] clear indicia of the information's materiality").

Hutchison's arguments about materiality fail.  He argues that the failure to disclose pulled-forward shipments was not material because "all shipments were accepted and paid for," "longtime distributor customers kept their orders and revenue flowing for years," and "distributor agreements did not prohibit early deliveries."  Def.'s Reply at 24.  In other words, because RTI's customers largely acquiesced to the early deliveries and did not (at the time of the early shipments) expressly prohibit early deliveries, Hutchison argues that it would not have been material to investors to know that RTI depended on early shipments to meet its revenue goals.  *First*, Hutchison does not dispute the SEC's more detailed facts about individual customers' dissatisfaction with early shipments and the steps those customers took to halt early shipments during the Relevant Period.  The undisputed facts

---

[3] Hutchison disputes the experts' conclusions by quibbling with the experts' assumptions, *see, e.g.*, PSUMF ¶ 414 (stating that the expert's conclusion of statistical significance would have lacked meaning if the market were not efficient).

show that pulled-forward shipments caused problems in RTI's customer relationships. *See, e.g.*, PSUMF ¶ 360. *Second,* whether or not it was technically proper to record revenue for early shipments, Hutchison fails to rebut the SEC's main point on materiality—that it mattered to investors *how* RTI was achieving its revenue guidance, and relying on future shipments to boost revenue created a never-ending cycle that was bad for RTI's business.

Hutchison argues that, in a hypothetical situation where RTI stopped pulling forward revenue, RTI's overall revenues for certain quarters would have increased. *See, e.g.*, Def.'s Opp'n at 4 ("[b]y recognizing early shipments, RTI reported lower revenue"). This argument asks the Court to imagine a world in which RTI never relied on pull-forwards— but the whole point of the SEC's case is that RTI *did* rely on pull-forwards. Hutchison's hypothetical analysis also contravenes the principle that "the materiality of a misrepresentation or omission must be assessed *as of the time* of the contested transaction." *Media Gen., Inc. v. Tomlin*, 387 F.3d 865, 869 (D.C. Cir. 2004) (emphasis added). As such, the relevant question is whether, at the time Hutchison made his statements in, for example, the Q1 2015 earnings call, it would have been material to investors to know that RTI had pulled forward $5.8 million in revenue from Q2 2015. PSUMF ¶ 225. At that point, the pull-forward from Q1 2015 to Q4 2014 had already occurred, so it is irrelevant whether investors would have considered the difference between the Q1 2015 pulled-forward amount and the Q4 2014 pulled-forward amount to be material. For the same reasons, Hutchison's reliance on the 2020 Restatement to argue that RTI's revenues were, in some instances, restated upwards is not persuasive. *See* Def.'s Br. at 33–34.

29

Hutchison next focuses on the six early shipments that lacked customer preapproval and argues that the amounts of those shipments were "immaterial and mathematically irrelevant to RTI's ability to meet its guidance." Def.'s Br. at 26. This argument, however, ignores the SEC's full theory, which is that the practice of using pulled-forward shipments—with or without customer approval—should have been disclosed as material. Further, "various qualitative factors may cause misstatements of quantitatively small amounts to be material." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 163 (2d Cir. 2000) (cleaned up); *see also S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 353 (S.D.N.Y. 2016) (various calculations were "only the starting point in the Court's materiality analysis" as "there are numerous circumstances in which misstatements below 5% could well be material" (quoting SAB No. 99 at 45152)). As shown in the table below, the six early shipments were anywhere from approximately 1% to 3% of total revenue for the quarter—and certainly affected the extent to which RTI met or exceeded its revenue guidance.

| Table 2: Early Shipments Without Preapproval | | | |
|---|---|---|---|
| **Quarter** | **Revenue Guidance** | **Reported Revenue** | **Early Shipments Lacking Preapproval** |
| Q1 2015 | **$66–67 million.** PSUMF ¶ 221 | **$68 million.** PSUMF ¶ 222 | None |
| Q2 2015 | **$70–71 million.** PSUMF ¶ 222 | **$71.6 million.** PSUMF ¶ 248 | **$535,245 Davol shipment** (PSUMF ¶ 88) |
| Q3 2015 | **$69–70 million.** PSUMF ¶ 248 | **$66.5 million.** PSUMF ¶ 281 | **$1.8 million Zimmer shipment (PSUMF ¶ 266) $259,335 Medtronic shipment (PSUMF ¶ 279)** |
| Q4 2015 | **$68–69 million.** PSUMF ¶ 321 | **$76.1 million.** PSUMF ¶ 321 | **$1.4 million Zimmer Dental shipment (PSUMF ¶ 307)** |
| Q1 2016 | **$65–66 million.** PSUMF ¶ 381 | **$67.4 million.** PSUMF ¶ 381 | **$1.6 million Synthes shipment (PSUMF ¶ 361)** |

| Q2 2016 | $66–67 million. PSUMF ¶ 398 | $67.6 million. PSUMF ¶ 398 | $1.4 million Zimmer shipment (PSUMF ¶ 402) |
|---------|------------------------------|------------------------------|---------------------------------------------|

Hutchison does not directly dispute the SEC's contention that recognizing revenue for the six early shipments did not violate GAAP. Def.'s Br. at 39. Rather, Hutchison argues that because these shipments were "all ordered and accepted by the customers, paid for, and never returned," it was not deceptive or material for RTI to recognize revenue for these shipments. *Id.* Hutchison points to his expert's opinion that RTI had a reasonable basis to recognize revenue for those six shipments. Def.'s Reply at 18. Hutchison's arguments are unpersuasive because he ultimately does not dispute that when RTI recognized revenue for these shipments, RTI's customers had not agreed to accept these shipments early, there was uncertainty about customer acceptance for at least some of these shipments, and that recognizing revenue for such shipments violated GAAP. *See* SEC Reply at 12–14. That the 2020 Restatement targeted premature recognition of revenue for shipments that were "delivered early without obtaining the customers' affirmative approval" underscores the materiality of RTI's misstatement of revenue. PSUMF ¶ 16. For all these reasons, summary judgment is warranted for the SEC on materiality.

### C.    *Scienter*

The scienter required for section 10(b) and Rule 10b–5 claims includes both "intent to deceive or defraud" as well as "extreme recklessness to that effect." *Lorenzo v. SEC*, 872 F.3d 578, 589 (D.C. Cir. 2017). Extreme recklessness is an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware."

31

*Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) (quoting *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992)).  By contrast, "[p]roof of negligence is sufficient to establish a violation of" Section 17(a)(2). *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006); *see Aaron v. SEC*, 446 U.S. 680, 696 (1980) (concluding that Section 17(a)(2) "is devoid of any suggestion whatsoever of a scienter requirement").  Negligence can be shown by "failing to disclose liabilities about which they *should* have known." *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992).

No reasonable jury could conclude that Hutchison was not—at least—extremely reckless.  There is *no* dispute that Hutchison knew about RTI's practice of pulling forward revenue from future quarters to meet revenue goals throughout the Relevant Period.  *See, e.g.*, PSUMF ¶¶ 113, 124, 217, 235, 263.  Indeed, Hutchison knew about customer complaints resulting from early shipments that were sent without preapproval.  *See, e.g.*, PSUMF ¶¶ 312 (Hutchison's knowledge of Zimmer's policy change due to early shipments), 358–65 (Hutchison's knowledge about Synthes shipment).  He knew that early shipments sent even with customer approval were straining customer relationships.  *See* PSUMF ¶¶ 263 (head of commercial division informed Hutchison that RTI was planning to ship $6.8 million in orders from 2015 Q4 in Q3), 327.  He also knew that in some cases, RTI's customers had declined to agree to early shipments, *see* PSUMF ¶ 262, and in other cases still the customer agreed to accept the early shipment with a discount, *see* PSUMF ¶¶ 105, 118, 264.

The undisputed facts show that Hutchison was aware of RTI's practice of using early shipments to meet revenue goals, and that he was also aware of the risks to RTI's business.

32

Yet he never disclosed RTI's reliance on pull-forwards in any of his public statements to investors even though it "must have been obvious, even to a layperson," that the omission "presented a serious danger of misleading investors." *S.E.C. v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 322 (D.D.C. 2014).

The record is replete with examples of Hutchison's knowledge throughout the Relevant Period. For example, as early as 2014, Hutchison was consulted about RTI's efforts to send a shipment early. PSUMF ¶ 217. In Q1 2015, RTI's CFO informed Hutchison of "not a good trend" of more revenue being generated in the last month of each quarter and told Hutchison that the Commercial division was "going to try and ship more to make up some of the shortfall" since "it would be nice to at least hit our guidance." *Id.* ¶¶ 85, 220. In Q2 2015, the CFO informed Hutchison that RTI could meet its revenue goals by customers agreeing to accept orders early. *Id.* ¶ 234. There are multiple instances of multimillion dollar "pull-in[s]" on weekly team meeting agendas. *See, e.g.*, PSUMF ¶¶ 113, 235, 261.[4] In Q3 2015, the head of the Commercial division informed Hutchison that they were planning to ship $6.8 million in products in Q3 from Q4 and that these shipments were straining customer relationships. *Id.* ¶ 263. Also in Q3, Hutchison was informed that Medtronic had declined to agree to a $2.5 million early shipment and characterized this development as "[n]ot good." *Id.* ¶ 262.

---

[4] Hutchison disputes the meaning of the term "pull-in" and suggests that it could refer to customers agreeing to accept early orders ("planned" orders), not unauthorized early shipments. *See, e.g.*, PSUMF ¶ 235. Whether these were authorized or unauthorized early shipments is beside the point because in both cases, RTI was relying on shipments "from the future" to meet its revenue goals, and the failure to disclose this practice is what rendered RTI's statements materially misleading.

The undisputed facts are also very clear that Hutchison became involved in the aftermath of the Synthes shipment during Q1 2016 that lacked preapproval. *See* PSUMF ¶¶ 358–65. Hutchison knew that express permission was not obtained in advance, *id.* ¶ 358, that there was "potential" that RTI would have to take the order back, *id.* ¶ 359, and that there were negotiations to get Synthes to accept the order so RTI could "close the books on the quarter," *id.* ¶¶ 366–68. Hutchison advised his team "not to push too hard" for a response from Synthes, saying "[a]s time goes by, this is [in] your favor[.]" *Id.* ¶ 369. Hutchison does not attempt to argue that he subjectively believed that the accounting for the Synthes transaction was proper at the time. Rather, Hutchison acknowledged as a general matter that he knew it violated GAAP to recognize revenue from a shipment if a customer had not agreed to it or approved it. *Id.* ¶ 135.

Several other factors underscore Hutchison's scienter. *First,* despite Hutchison's knowledge about RTI's reliance on pulled-forward shipments—including shipments that had not been previously approved by the customer—Hutchison did not seek the advice of the controller, RTI's audit committee, the Board, or RTI's external auditor (Deloitte). PSUMF ¶¶ 140 (controller), 163–64 (Board and audit committee), 145–57 (Deloitte). Hutchison's failure to seek counsel strongly supports that he was, at a minimum, extremely reckless. *See S.E.C. v. Guenthner*, 212 F.R.D. 531, 534 (D. Neb. 2003) (when defendants knew of an error but "took no steps to correct it" and "directed employees to record receivables," these "attempts to conceal their activities raises the inference that they knew the activities were wrong"). The undisputed fact that some RTI employees understood "early shipments" and "order book management" to be the same thing, as well as the fact

34

that one RTI employee heard Hutchison express a preference for "order book management" over "early shipment" further supports the inference of scienter. *See* PSUMF ¶ 127; *cf. In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 892 F. Supp. 2d 59, 67 (D.D.C. 2012) (no scienter where "no witness testified that [defendant] ever told him to violate GAAP"). Hutchison subjectively disputes what he meant by "order book management," suggesting that it referred to a broader set of communications with customers about "what will be available to the customer." PSUMF ¶ 127; *see* Def. Tab 13 [Dkt. #34-15] at 16:3. But Hutchison's subjective views cannot generate a genuine factual dispute about how other employees understood "order book management." And a defendant's subsequent subjective belief is not sufficient to establish a genuine dispute of fact when the other undisputed facts establish scienter. *See S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010) (affirming grant of summary judgment on scienter despite defendant's subjective belief).

*Second*, Hutchison's position of authority as RTI's longstanding CEO, with responsibility over RTI's financial statements and revenue guidance, further strengthens the inference of scienter. PSUMF ¶¶ 35–39, 43. Hutchison had extensive experience with corporate accounting and finance before he became CEO. *Id.* ¶ 30–33. Hutchison did his "very best" to stay informed about what was going on at RTI, attended weekly meetings with his direct reports, received monthly reports from the commercial division, and attended a monthly business review with RTI's CFO and commercial division staff. *Id.* ¶¶ 45–48. His "role as CEO" made it "all the more plausible," *SEC v. Jacoby*, 2018 WL

35

3732102, at *6 (D. Md. Aug. 3, 2018), that he knew, or should have known, of his obligation to disclose material information about pulled-forward shipments to investors.

*Third*, Hutchison had ample motive to conceal information that could have negatively affected RTI's stock price or undermined confidence in RTI's ability to achieve its revenue goals. Just as "lack of motive . . . may in turn be relevant to the question of scienter," *Graham v. SEC*, 222 F.3d 994, 1005 (D.C. Cir. 2000), undisputed evidence of motive may support scienter, *see SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 322 (D.D.C. 2014) ("motive" is a "strong indicia of scienter"). The undisputed facts show that Hutchison had a powerful motive to represent that RTI was meeting its revenue targets, while omitting information that would undermine investors' confidence in RTI. Hutchison believed that it was important for RTI to hit its revenue numbers, PSUMF ¶ 10; he knew that his compensation and bonuses were tied to RTI achieving certain metrics, *id.* ¶¶ 52–53; and he owned significant amounts of RTI stock, *id.* ¶ 56. For example, Hutchison's 2015 bonus was tied to achieving "Base Revenues" of $257.4 million and year-over-year growth of 3%, with a full bonus tied to revenue of $270.9 million and year-over-year growth of 9%. *Id.* ¶ 53. Hutchison ultimately received a bonus of $208,622 in 2015 and shares of RTI stock worth $600,000. *Id.* ¶ 55. During the relevant period, Hutchison also faced criticism for his performance as CEO. *See* PSUMF ¶¶ 59–60 (investor wrote to RTI's Board in November 2015 arguing that new leadership was needed). There is no dispute that Hutchison stood to profit from RTI's performance, and that he would also have been motivated to omit information that would have reflected poorly on RTI and on himself.

36

Indeed, consistent with Hutchison's motives, the undisputed facts show that Hutchison repeatedly exhorted his employees to focus on meeting RTI's revenue goals. *See, e.g.*, PSUMF ¶¶ 258 (September 7, 2015 email from Hutchison to RTI executives questioning whether the Commercial division "can bail us out [this] quarter" and directing them "to do better" and "deliver on our commitment to the street"), 331 (March 22, 2016 email from Hutchison to RTI executives saying "I am told that [Commercial] have no more upside .... There is no cushion no room for error. We need to hit the guidance, at a minimum ... at the top end of the range."). Such exhortations were by no means improper—but they support the inference that Hutchison placed such heavy emphasis on meeting revenue goals that he recklessly omitted information that would have undermined the narrative of RTI's success.

Subject to one exception discussed below, Hutchison's arguments about scienter are not compelling. *First*, Hutchison argues that Dean Bergy, the Chair of RTI's Board and Audit Committee, testified that Hutchison was "honest and upright, ethical, trustworthy, incapable of fraud, and a person he would be happy to work with again." Def.'s Br. at 34; DSUMF ¶ 9. One person's subjective general assessment of Hutchison's character is simply not relevant to whether Hutchison, with regard to the specific claims in this case, possessed the requisite mental state. *Second*, Hutchison argues that he "relied on credentialed accounting professionals" including RTI's CFO, controller, RTI's Audit Committee, and Deloitte, throughout the Relevant Period. Def.'s Br. at 34. Even if reliance on accounting professionals were a valid defense, the "prerequisite[]" to such a defense is "complete disclosure to [the professional]." *Zacharias v. SEC*, 569 F.3d 458, 467 (D.C.

Cir. 2009).  Here, there is no dispute that Hutchison *failed* to "apprise his advisor[s] of all the material facts."  *SEC v. Goldsworthy*, 2008 WL 8901272, at *5 (D. Mass. June 11, 2008); *see also E-Smart Techs.*, 74 F. Supp. 3d at 323.  Hutchison does not even attempt to argue that he shared what was happening with pulled-forward revenue with these parties. The SEC, by contrast, points to undisputed facts showing that the controller was never asked to reverse these transactions, *see, e.g.*, PSUMF ¶ 140, and RTI's Audit Committee and Deloitte were unaware of the issues with early shipments at the time, *see, e.g.*, PSUMF ¶¶ 145–57, 163–64.  To the extent Hutchison discussed these issues with RTI's CFO, Hutchison has not attempted to establish that any discussions with the CFO would satisfy the advice of counsel defense.  And the fact that RTI's CFO later settled with the SEC for similar conduct during the Relevant Period makes it even more implausible that Hutchison can escape liability by pointing to his reliance on the CFO.

Hutchison's only meritorious argument about scienter relates to the GTR transaction.  The question is whether Hutchison intentionally or recklessly failed to make a separate disclosure about the GTR transaction in RTI's public reporting.  A reasonable jury could conclude that Hutchison believed he was appropriately reporting the GTR transaction.  Unlike the pulled-forward shipments, Hutchison disclosed details about the GTR transaction to the RTI Board.  *See* DSUMF ¶¶ 128–29.  He shared that the GTR transaction would allow RTI to "record $7.2 million of revenue" and would "help overall in sales, profits, cash flow, inventory, consignment risk, and the banks and overall set up of a relationship with Zimmer Biomet that is similar to our other corporate partners."  *Id.* ¶ 128.  Hutchison discussed with RTI's CFO whether RTI needed to make a separate

38

disclosure of the transaction, and the CFO told Hutchison that he "knew for sure" that separate disclosure was not required. *Id.* ¶ 131. If a "jury finds that [Hutchison] genuinely *thought* it was" appropriate to not make a separate disclosure, "it could find that [he] lacked scienter." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 816 F. Supp. 3d 423, 436 (S.D.N.Y. 2026). So I will deny summary judgment to both parties on Hutchison's liability with regard to Hutchison's scienter about the GTR transaction, but will otherwise grant summary judgment to the SEC on scienter.

## II. Book and Records Violations (Counts III, IV, V, and VI)

Each party seeks summary judgment on four claims described as "books and records" claims, which focus more narrowly on the six shipments that the SEC alleges RTI sent early to customers without preapproval and improperly recorded revenue for.

### A. *Rule 13b2-1 (Count III) and Exchange Act § 13(b)(5) (Count V)*

Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2–1.

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall *knowingly* circumvent or *knowingly* fail to implement a system of internal accounting controls or *knowingly* falsify any book, record, or account" required by other provisions of the Exchange Act. 15 U.S.C. § 78m(b)(5) (emphasis added).

"[O]mitt[ing] essential details" from accounting reports, *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 394 (S.D.N.Y. 2014), or knowing of a GAAP

violation and withholding information about it, *see S.E.C. v. Egan*, 994 F. Supp. 2d 558, 568 (S.D.N.Y. 2014), violate both Rule 13b2-1 and Section 13(b)(5).

Hutchison knew about the Synthes transaction and all of the relevant facts indicating that recognizing revenue for the Synthes transaction violated GAAP. *See* PSUMF ¶¶ 360–70. He was also aware that early shipments without customer preapproval were causing problems with RTI's customers. *See, e.g.*, PSUMF ¶¶ 262, 365. His failure to disclose the GAAP violation therefore violated Rule 13b2-1 and Section 13(b)(5).

Hutchison does not raise arguments specific to these claims and instead repeats the argument that the early shipments sent without preapproval were "ordered and accepted by the four customers and that all were paid for . . . and never returned." Def.'s Br. at 40–41. Hutchison does not dispute the facts indicating that *at the time* RTI recognized revenue for the Synthes transaction, there was significant uncertainty about whether Synthes would keep the shipment, which Hutchison recognized. PSUMF ¶¶ 360–70. So I will grant summary judgment to the SEC on these claims.

**B.**   ***Rule 13b2-2 (Count IV)***

The SEC also asserts that Hutchison violated Rule 13b2-2(a) by making materially misleading statements to accountants. Rule 13b2-2 provides in relevant part:

> No director or officer of an issuer shall, directly or indirectly (1) [m]ake or cause to be made a materially false or misleading statement to an accountant in connection with; or (2) [o]mit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant . . .

17 C.F.R. § 240.13b2-2(a) (emphasis added). Scienter is not an element of a Rule 13b2-2 violation—mere negligence suffices. *See S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 361 (S.D.N.Y. 2016).

"Misstatements in management representation letters . . . are sufficient to state a claim for a violation of Rule 13b2-2." *Id.* at 361. It follows that Hutchison's material omissions in his management representation letters violated Rule 13b2-2(a). Hutchison signed quarterly management representation letters to RTI's external auditors affirming that RTI's financial statements were in compliance with GAAP and that he was not aware of any fraud. PSUMF ¶ 44. Deloitte's engagement partner in 2016 later agreed that Hutchison's statements in the management representation letters to Deloitte were "false." PSUMF ¶ 160. For the reasons previously stated, Hutchison was at least extremely reckless as to the statements he made, and summary judgment is warranted for the SEC on this claim.

## C.    *Rule 13a-14 (Count VI)*

The SEC further claims that Hutchison violated Rule 13a-14 by falsely certifying RTI's filings, which contained improperly stated revenues. Rule 13a-14 states that "[e]ach report" "must include certifications" of the truthfulness of the filings, and "[e]ach principal executive" of the company "must sign a certification." 17 C.F.R. § 240.13a-14. These certifications require the executive to certify that the executive has reviewed the report, and that "based on the officer's knowledge," the report "does not contain any untrue statement of a material fact or omit to state a material fact" and "fairly present[s] in all material

41

respects the financial conditions and results of operations" of the company.  15 U.S.C. § 7241(a).

For all the reasons previously discussed, Hutchison knew that RTI improperly recognized revenue and was relying on pulled-forward revenue to achieve its revenue goals.  He knew or was extremely reckless in not knowing that RTI had failed to disclose this information.  Yet he nonetheless certified all of RTI's filings during the Relevant Period.  PSUMF ¶ 40.  Hutchison's certification of filings containing materially false or misleading information violated Rule 13a-14, *see S.E.C. v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 87 (D.D.C. 2014), so I will also grant summary judgment to the SEC on this claim.

## III.    Aiding and Abetting RTI's Violations (Counts VIII, IX and X)

The SEC argues that Hutchison aided and abetted RTI's violations of Sections 17(a)(2), (a)(3) of the Securities Act; Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act; as well as Rules 12b-20, 13a-1, 13a-11, and 13a-13.

To establish liability for aiding and abetting another's federal securities law violations, the SEC must show "three principal elements": "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—*i.e.*, that she rendered such assistance knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000); *see* 15 U.S.C. §§ 77o(b), 78t(e).  An alleged aider and abettor acts knowingly or recklessly if, at a minimum, he encounters "red flags" or "suspicious events creating reasons for doubt" that should alert him to the primary violator's improper conduct.  *Graham*, 222 F.3d at 1006.

42

Summary judgment for the SEC on Hutchison's aiding and abetting of RTI's violations of Sections 17(a)(2) and 17(a)(3) is warranted for similar reasons as to why Hutchison himself is liable for fraud. The same facts establishing Hutchison's principal violations establish that RTI violated the securities law. RTI later settled with the SEC based on all of the violations that Hutchison is argued to have aided and abetted. *See* PSUMF ¶ 27. Hutchison provided "substantial assistance" by certifying SEC forms containing false or misleading information and permitting recognition of revenue despite GAAP violations. *Id.* ¶ 40.

Summary judgment should be granted to the SEC on Hutchison's aiding and abetting of RTI's violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 because Hutchison provided "substantial assistance" to RTI in its preparation of false or misleading Forms 10-Q, Forms 10-K, and Forms 8-K. PSUMF ¶ 40. Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 require issuers to file annual, current, and quarterly reports with the SEC regarding their operations and finances. 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13. The obligation to file reports under Section 13(a) includes the obligation that the filings be accurate. *See SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978). Rule 12b-20 further requires disclosure of additional information as may be necessary to make the reports not misleading. 17 C.F.R. § 240.12b-20.

RTI's SEC forms were misleading in that they included improperly stated revenue, failed to disclose RTI's reliance on pulled-forward shipments, and failed to disclose the harm to customer relationships resulting from the early shipments.

43

Summary judgment should be granted to the SEC on Hutchison's aiding and abetting of RTI's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) for similar reasons as to why Hutchison himself is primarily liable for the books and records violations. Section 13(b)(2)(A) requires an issuer to "make and keep books, records, and accounts" that "accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). Section 13(b)(2)(B) requires an issuer to "maintain a system of internal accounting controls sufficient to provide reasonable assurances that," among other things, the company's financial statements can be prepared "in conformity with [GAAP]." 15 U.S.C. § 78m(b)(2)(B). Scienter and materiality are not required to establish violations of Sections 13(b)(2)(A) and 13(b)(2)(B). *See S.E.C. v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998); *S.E.C. v. Stanard*, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009). RTI violated these sections by recognizing revenue in violation of GAAP and failing to maintain internal controls to prevent such violations. Hutchison aided and abetted these violations at least with regard to the Synthes transaction.

## IV.   Reimbursement for Material Noncompliance Under SOX (Count VII)

The SEC asserts that, pursuant to Section 304 of the Sarbanes-Oxley Act ("SOX"), Hutchison must reimburse RTI for the bonuses, incentive-based compensation, and profits he received from March 7, 2016 (the filing date of the 2015 Form 10-K) to November 7, 2017 (12 months after the filing of the 2016 Q3 Form 10-Q). *See* SEC Br. at 45.

Section 304 of SOX provides as follows:

**(a) Additional compensation prior to noncompliance with Commission financial reporting requirements**

44

> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer . . . of the issuer shall reimburse the issuer for—
>
> > (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
> >
> > (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243. The SEC argues that RTI's 2020 Restatement qualifies as an "accounting restatement," that it was issued "due to the material noncompliance" of the issuer, *i.e.*, RTI, that it was a "result of misconduct," and that Hutchison, as the CEO during the Relevant Period, must reimburse RTI for certain types of compensation he received during that period. *See* SEC Br. at 45.

I will grant summary judgment to the SEC on the SOX reimbursement claim, with one modification. RTI prepared an "accounting restatement" in 2020 covering year-end financials for 2015 and quarterly financials for 2016, 2017, and 2018. PSUMF ¶ 15. The restatement was due to the "material noncompliance" of RTI, as found by the Restatement. PSUMF ¶ 17. As described throughout this opinion, both RTI and Hutchison engaged in "misconduct" that led to the Restatement. Summary judgment is warranted for the SEC on the SOX reimbursement claim for the "bonus[es]" and "other incentive-based or equity-based compensation," along with "any profits realized from the sale of securities of" RTI,

45

from March 7, 2016 (date of RTI's 2015 Form 10-K) until August 4, 2017 (12 months after the filing of RTI's 2016 Q2 Form 10-Q).[5]

Hutchison's arguments to the contrary fail. *First*, Hutchison argues that Section 304 is "facially incomprehensible and, accordingly, unenforceable." Def.'s Br. at 42. Hutchison identifies no court that has agreed that Section 304 is unconstitutional on its face, and numerous courts have held that Section 304 is constitutional and may be enforced. *See, e.g., S.E.C. v. Life Partners Holdings, Inc.*, 2013 WL 12076555, at *3 (W.D. Tex. Nov. 19, 2013) ("statute easily passes constitutional muster"); *S.E.C. v. Baker*, 2012 WL 5499497, at *8 (W.D. Tex. Nov. 13, 2012) (rejecting "void-for-vagueness" challenge to Section 304).

*Second*, Hutchison argues that there was no "material noncompliance" because a subsequent "SAB 99 Memo" "was unable to make a finding that the supposed errors in its financial statements were 'material' in amount." Def.'s Br. at 43. The undisputed facts, however, show that the "SAB 99 Memo" concluded that the errors were "qualitatively material." DSUMF ¶ 154; PSUMF ¶ 20. The auditor who prepared the SAB 99 Memo later explained that the memo did not conclude that the errors were "quantitatively material," *see* DSUMF ¶ 154, but it is also undisputed that RTI's Audit Committee and subsequent management believed that the Restatement was "needed," *see* PSUMF ¶ 17.

---

[5] The SEC argues that reimbursement is warranted until 12 months after the date of RTI's 2016 Q3 10-Q (November 7, 2017), *see* SEC Br. at 45, but the Relevant Period for the SEC's claims only goes through 2016 Q2, not Q3, *see id.* at 1. Apart from the Restatement itself, the SEC has not provided facts substantiating specific "misconduct," 15 U.S.C. § 7243(a), during 2016 Q3. Accordingly, I will grant summary judgment to the SEC on the SOX reimbursement claim for the reimbursement period ending 12 months after the Q2 filing.

Hutchison does not explain why it matters that the SAB 99 Memo lacks a finding of quantitative materiality when the Memo and Restatement concluded that the errors were qualitatively material.

*Third*, Hutchison suggests that Section 304 is unclear about whose misconduct triggers Section 304 liability and what types of "financial document[s]" qualify. *See* Def.'s Br. at 43–44. Courts analyzing Section 304 claims have consistently held that the relevant misconduct is the misconduct of the "issuer"—here, RTI—and that SEC filings such as Forms 10-Q and 10-K trigger liability. *See S.E.C. v. Jensen*, 835 F.3d 1100, 1114 (9th Cir. 2016) ("it is the issuer's misconduct that matters"); *S.E.C. v. Mercury Interactive, LLC.*, 2011 WL 1335733, at *2 (N.D. Cal. Apr. 7, 2011) ("reporting requirements" refer to "an issuer's obligation to file quarterly and annual reports"); *Baker*, 2012 WL 5499497, at *3 (Section 304 claim based on Forms 10-K and 10-Q could proceed).

*Finally*, Hutchison argues that he cannot reimburse RTI because he is no longer CEO and RTI is no longer a publicly traded company. *See* Def.'s Br. at 44. Again, courts have rejected these arguments—so long as Hutchison was CEO and RTI was an "issuer" of securities during the relevant period, Section 304 permits the SEC to seek reimbursement. *See S.E.C. v. Brooks*, 2017 WL 11591855, at *2 (S.D. Fla. Nov. 27, 2017) ("SOX 304 does not require the issuer be in existence throughout the pendency of an SOX 304 reimbursement action.").

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that plaintiff's Motion for Summary Judgment [Dkt. #30] is **GRANTED** in part and **DENIED** in part, and

47

defendant's Motion for Summary Judgment [Dkt. #32] is **DENIED**. An accompanying order will issue contemporaneously with this opinion.

_____

RICHARD J. LEON
United States District Judge